[L. A. No. 5145. In Bank.—October 19, 1920.]

BLANCHE M. WHITEMAN, Appellant, v. CITY OF SAN DIEGO (a Municipal Corporation), et al., Respondents.

[1] HIGHWAYS—PUBLIC USER FOR FIVE YEARS—CONCLUSIVE PRESUMPTION OF INTENTION TO DEDICATE.—While it is true that an actual intention to dedicate property to public use as a highway is essential to such dedication, the intention is conclusively presumed from an adverse user by the public for five years, and the mere denial on the part of the owner of any such intention, or evidence which might otherwise satisfy the court that there was no such actual intention, cannot be considered in opposition to the title acquired by the public by its hostile use.

[2] ID.—CREATION OF HIGHWAY BY USER—ESSENTIALS.—Use by the public alone may be sufficient to create a highway, but such use,

---

1. Dedication of public streets and highways, notes, 57 **Am. St. Rep.** 752; 129 **Am. St. Rep.** 579.

Presumption of dedication from user of highway, note, **Ann. Cas.** 1914D, 335.

Public user as acceptance of dedicated highway, notes, 3 **Ann. Cas.** 792; 18 **L. R. A.** 510.

if alone relied upon, must be of such a character and under such circumstances as to indicate clearly to the owner, if advised thereof, or, if not, such as might be readily ascertained by the owner, so as to advise him, knowing the character of the use, that such use was hostile and adverse.

[3] ID.—CASUAL USER OF UNIMPROVED STREET ACROSS UNINCLOSED AND UNOCCUPIED LAND—INSUFFICIENT NOTICE OF ADVERSE USER. A mere casual user by the public of an unimproved and almost impassable street running across uninclosed and unoccupied land, the surrounding country being almost uninhabited, is not a user of such a nature as to give notice to the owner that the use was under a claim of right.

APPEAL from a judgment of the Superior Court of San Diego County. W. A. Sloane, Judge. Reversed.

The facts are stated in the opinion of the court.

Haines & Haines for Appellant.

Doolittle & Morrison, T. B. Cosgrove, City Attorney, and M. R. Thorp, Deputy City Attorney, for Respondents.

WILBUR, J.—This is an action to quiet title of plaintiff to certain property against certain liens for the improvement of Ohio Street, and also to enjoin the issuance of bonds for such assessments made upon plaintiff's adjoining land for the improvement of said street. Both parties state that the question before this court is whether that portion of Ohio Street running through the property of the plaintiff is or is not a public street. In 1888 a map was filed by the contestants of plaintiff's predecessor, whereon Ohio Street was shown as now claimed by the city. The plaintiff's predecessor was not a party to the filing of this map, and, claiming that he was not bound thereby, secured a judgment against the city of San Diego and others interested, quieting title to the land included in such street, and canceling the map in question March 15, 1895. On February 18, 1904, a map showing plaintiff's land subdivided into lots and blocks and showing Ohio Street running through it was attached to a *lis pendens* in an action brought by the College Hill Land Association against the city of San Diego, and recorded in the office of the county recorder. From 1907 the city assessor and from 1908 the county assessor assessed the

property of plaintiff according to this map by lot and block, and omitting that portion of her land covered by Ohio Street. Plaintiff protested against this form of assessment without avail. Her agent, without her knowledge or authority, filed verified tax statements for the years 1910 and 1911, according to such subdivision. If there is any inference of dedication to be drawn from the fact that the land was thus assessed and the taxes paid by the owner according to such assessment, that inference is entirely overcome by the protest of the owner against such assessment. There is, then, in the record, no evidence of actual intention to dedicate this land, except such as arises as a matter of law from adverse user. The owner lived in the Philippine Islands from 1904 until 1907, and had no direct personal knowledge of the condition of the property, and thereafter only visited San Diego twice, for a few days each time. The trial court found that the public had acquired the street by adverse user for more than five years, and the judgment is based upon this finding. Plaintiff appeals and attacks the finding as not supported by the evidence. At all times up to the beginning of the street improvement proceedings the neighborhood was sparsely settled, and up to four or five years previous to the adoption of the resolution of intention there were only a few scattered houses in the neighborhood. There was for a period of approximately five years before January, 1912, more or less travel upon Ohio Street, and the question is whether or not this travel was of such a nature and for such a period as to justify the finding of the trial court that the public had acquired an easement by adverse possession. Travel along the street increased with the building up of the neighborhood, hence the least amount of travel during the prescriptive period was during 1907 and 1908. We will state those portions of the evidence relied upon by respondents to show such user. George A. d'Hemecourt, a civil engineer, testified that in the year 1899 he had surveyed the entire length of Ohio Street and had placed stakes at every block and every intersection of the street; that there was then no travel along the street; that in 1904 he had placed reference points in the center of the street so that people owning lots could "brush a road" through; that the brush was cut out about 1904 and 1905. Henry Ellers

testified as follows: "I know that there has been a street there ever since I have been there because we can tell where the line was. We could drive straight north from University north." He further testified that he bought a lot on Ohio Street in 1906; that he had driven along Ohio Street (across plaintiff's property) to Madison Street many times before; that in 1907 he hauled a load of chickens up there for a man named Lilly, who lived at the corner of Adams and Ohio, and that he had driven there a good many times; that there were teams going along there. The street was not graded. There was a wagon road being used and that road had continued to be used since that time. "In 1907 there was a wagon road, that is all. It was not graded. It was all up and down and over bumps. A few wagons were driven there. We could tell where the streets were. When I first drove it over at the time I got there there was not much teaming there, but the road was there and it has been there ever since." On cross-examination he testified that at the time he was there there was nothing done to the streets, that they were rough and ungraded. "The way I found the line of this so-called street when I drove up there to get Mr. Lilly's chickens and chicken-coop [1907] was that there was Works up there. He lived two blocks north of that, and my house was supposed to front on Ohio Street. That is the way we found the line. There was some marks. There was stakes up on Adams. I do not remember that there were any houses between El Cajon Avenue and Monroe Avenue [plaintiff's property is between these points] as it is now up there along this Ohio Street. Works lives on Adams, two blocks, I think, or three blocks west. As to the amount of travel nine years ago [1906] there was not much doing there. Once in a while I seen a team pass up there. The teams were not confined to any particular route. You could not travel all over. You did not keep to the road where the street should be. The first improvement I saw made on Ohio Street northward from El Cajon Avenue was that it was graded in 1912. There were buildings, a lot of buildings built up all through there. When I got there, there was hardly a house east of the Normal but two or three. They commenced building about 1909." Thomas

L. Works lived in the neighborhood for twenty years and testified that he could not definitely fix the beginning of travel there. As near as he could fix it it was four or five years prior to the grading of the street; that the travel took a zigzag course according to the formation of the ground. "That formation up there is awfully hilly, full of hummocks. I was over the tract oftener than once a month. One could travel over what is now Ohio Street before Mr. Hyde graded it. There were hummocks and a few houses, naturally there was a way of getting through to them. You could not call it a defined street. There was not any way of getting through except following around zigzag through these hills." He stated that he did some grading on the street about a year and a half before Ohio Street was graded and that at that time this zigzag track would not carry one farther afield than the line of an eighty-foot street. C. L. Hyde, a witness for the defendants, testified that he had been familiar with the physical condition of Ohio Street from University Avenue to Adams Street from 1910; that the street was in a more or less rough condition, but was traveled right along; that there was a well-defined wagon road which consisted of wagon tracks excepting the south end which is more of a level country; that probably two blocks of the south and north of and intersecting El Cajon Avenue had been graded by the property holders; this would cover a part of plaintiff's property; that some hummocks had been cut down in the center of the street on plaintiff's property; that the balance of the road was passable; that he could not say whether there was anybody living on the plaintiff's tract or not; that there were some furrows plowed along the curb line. "In most places there might be more than the width of a wagon track. There were some hummocks or round knolls that would not be worn enough to give room enough to pass. Take it all through there was plenty of room for two vehicles to pass side by side. The street was roughed out all the way through." Frank Barber, of the city engineer's office of San Diego, testified that in 1909 he had set stakes at the street corners along Ohio Street on both sides of the street; that at that time the brush had been cut off a portion of Ohio Street thirty or forty feet in width between El Cajon and Madison Avenues; that there was a passable roadway

along there; that a portion of the street had been closed and the hummocks cut off by a road grader and the earth shoved into the center to make a roadway for travel. This was through plaintiff's property. E. J. Walker, the superintendent of the respondent contracting company which did the work of grading and curbing Ohio Street, testified that he had been familiar with the street about two years before the work was done; that at the time the work was done from Madison on down to Monroe, "although a little rougher than the first block south of Adams, still that road ran on down through there. The brush was all taken out of it. It continued on down that way until it got to Meade Street. That is as near as I could tell you how I found the road. The brush had all been cleared away. We did not have to cut any brush at all. There was a well-defined roadway when I went there and the public had been using it." From this testimony, construed most favorably to the respondents, it appears that plaintiff's land, consisting of a little over six acres, is in the heart of a subdivision originally made in 1888; that all the streets in this subdivision were thus dedicated to public use and by a formal ordinance, not hereinbefore referred to, accepted by the city; that all the streets in the tract became public streets, save only in that part of the tract which was set apart to the plaintiff's predecessor by a decree of partition; that in connection with the subdivision of this tract the street corners were indicated by surveyor's stakes; that plaintiff's tract of land completely blocked Ohio Street and Monroe Avenue. In 1906 there was a well-defined wagon road along Ohio Street through plaintiff's property, zigzagging to avoid hummocks in the street, but confined to the street. This road was used constantly from that time forward by all who found occasion to do so, and during the entire five years previous to the beginning of the proceedings to improve the street this roadway had been clearly marked and constantly used. It is evident that the actual use of the street did not extend its full width through plaintiff's property. The road was "brushed out" the thirty or forty feet in width in 1909, and to the full width by 1912. The wagon road zigzagged through the plaintiff's property, but was confined to the eighty-foot strip claimed by the city

as a street. The distance which Ohio Street traverses the plaintiff's property was about 430 feet.

The decree of 1895 quieting the title of plaintiff's predecessor to the land in question is strongly relied upon by the appellant as fixing the rights of the parties and preventing the running of the statute of limitations. Appellant claims that "the record is bare of any testimony whatsoever tending to show that the plaintiff had the slightest knowledge that anyone was traveling over her land at all, much less that anyone was doing so under the adverse claim of a street, according to that duplicate map or otherwise"; that in default of such notice or of any acquiescence on her part to any claim of the city, no title could be gained by adverse user. (*Barnes* v. *Daveck,* 7 Cal. App. 487, [94 Pac. 779].) [1] It is true that an actual intention to dedicate property is essential to such dedication. (*Smith* v. *San Luis Obispo,* 95 Cal. 463, [30 Pac. 591].) But the theory on which the prescriptive right of the public to the street is based is that from an adverse user of five years the intention of the owner to dedicate the property to such use is conclusively presumed, and the mere denial on the part of the owner of any intention to dedicate, or evidence which might otherwise satisfy the court that there was no such actual intention, cannot be considered in opposition to the title acquired by the public by its hostile use. Appellant places great emphasis upon the fact that the map filed with the *lis pendens* in 1904 in the office of the county recorder was not only unauthorized by her, but was improperly recorded. We attach no significance whatever to this map so far as the rights of the parties are concerned. Plaintiff was not in any manner bound by this map, and its existence on the records tends to explain, though not to justify, the assessment of the plaintiff's land by lot and block.

From the foregoing evidence the court was justified in finding that there had been a public use for five years. But the question remains, Was such use adverse, that is, under a claim of right? It is clear from the evidence that the owner was never notified in any way of such a claim, and was relying not only on her ownership of the land, but upon a decree of court, expressly deciding that the city had no rights therein. After plaintiff paid her taxes in the fall of 1907, she ascertained from her receipt that the land was

assessed in accordance with the subdivision theretofore declared by the court to be unauthorized and not bringing in plaintiff. Her demand that the property be assessed as a whole was refused. If, however, we assume that this act of the assessor, who had no authority or control over the public streets, amounted to an adverse claim of right in the street, such claim was brought to her attention less than five years before the street improvement was completed, and consequently cannot aid us in considering the character of the use from January to July, 1907.

Appellant claims that the judgment quieting the title of plaintiff or her predecessor against the city estopped the latter from making the claim of right to the street essential to the securing of title by adverse possession, citing *Hintrager* v. *Smith*, 89 Iowa, 270, [56 N. W. 456]; *Larum* v. *Wilmer*, 35 Iowa, 244, 247, and that thereafter, in order to start the statute of limitations running, it was essential that actual notice be given to the owner of the intention to claim the property adversely (citing *Root* v. *Woolworth*, 150 U. S. 401, 414, 415, [37 L. Ed. 1123, 14 Sup. Ct. Rep. 136, see, also, Rose's U. S. Notes]), and that prior to the giving of such notice any possession by the city would be held permissive only. The rule stated in *Root* v. *Woolworth, supra,* is cited as the law in 2 Corpus Juris, page 163, section 299. It is also followed in the recent case of *Midkiff* v. *Colton,* 252 Fed. 420, [164 C. C. A. 344], and was followed in the earlier case of *DuPont* v. *Charleston Bridge Co.,* 65 S. C. 537, [44 S. E. 86]. The question does not seem to have been directly raised in or decided by this court. But the principle relied upon in *Root* v. *Woolworth, supra,* was that in the decree in a suit to remove a cloud from the title by which a conveyance was required to be made by the defendant to the plaintiff, the situation was substantially that between a grantor and grantee, and that the grantor, after the grant, was deemed to hold in subordination to the claim of his grantee. In numerous cases in this state involving the adverse possession by a grantor as against a grantee, it is nowhere held that actual notice of the adverse possession other than that derived from the possession itself was essential to start the statute of limitations running. In all of these cases it was assumed, and in some of them stated, that the rule was no different between a grantor and grantee

and the grantor and a stranger. (*Franklin* v. *Dorland,* 28
Cal. 175, [87 Am. Dec. 111]; *Dorland* v. *Magilton,* 47 Cal.
485; *Lord* v. *Sawyer,* 57 Cal. 65; *Garabaldi* v. *Shattuck,* 70
Cal. 511, [11 Pac. 778]; *Barker* v. *Clark,* 128 Cal. 181, [60 Pac.
677]; *Allen* v. *Allen,* 159 Cal. 197, [113 Pac. 160]; *Hodgkins*
v. *People's Water Co.,* 177 Cal. 730, [171 Pac. 945].) For
instance, in *Allen* v. *Allen, supra,* it is said: "He [the
grantor] stood in relation to his title asserted by adverse
possession as would any other adverse claimant, and it was
necessary for him to make full proof of all the conditions
in order to constitute it." The supreme court of Texas in
*Thomson* v. *Weisman,* 98 Tex. 170, [82 S. W. 503], refused
to follow *Root* v. *Woolworth, supra,* upon the ground that
the matter had been determined to the contrary in *Pendleton* v. *McMains,* 32 Tex. Civ. App. 575, [75 S. W. 349].
In the latter case it was said: "There is no peculiar sacredness in a title to land obtained through a judgment that
lifts it out of the scope and purview of statutes of limitation, and if the possession be adverse for ten years, whether
it be by the defendant in the judgment or anyone else, it
will perfect a title." It is stated in *Thomson* v. *Weisman,*
*supra,* that "this court has held a vendor, by executed conveyance, who remains in possession of the land, claiming it
as his own, without notice other than possession, may acquire
against his vendee a title by limitation." In *Hodgkins* v.
*People's Water Co., supra,* this court, in holding that the
defendant in an ejectment suit could gain title by adverse
possession against the plaintiff, although the judgment was
in favor of the plaintiff, cited the case of *Pendleton* v.
*McMains, supra,* as authority for the proposition that "adverse possession for ten years after the rendition of judgment in an ejectment suit, where no writ of possession was
issued, established a title against the plaintiff independent
of, and subsequent to, the right of possession adjudicated
in the ejectment suit." [2] Use by the public alone may
be sufficient to create a highway (*Schwerdtle* v. *County of
Placer,* 108 Cal. 589, 594, 595, [41 Pac. 448]). But such
use, if use alone is relied upon to establish the right of the
public, must be of such a character and under such circumstances as to indicate clearly to the owner, if advised thereof,
or, if not, such as might be readily ascertained by the
owner, so as to advise the owner, knowing the char-

acter of the use, that such use was hostile and adverse. The point at issue then resolves itself· into this question: Was the use by that portion of the public that traveled across plaintiff's land during the first six months of 1907 of such a character as to advise the plaintiff, if she had known thereof, that such use was under a claim of right. [3] We conclude from the evidence in the case that the trial court was not justified in holding that the use by the public was of such a nature as to give notice that the use was under a claim of right. The surrounding country was almost uninhabited. The use of the wagon road across plaintiff's land must necessarily have been very slight, although it was no doubt sufficient to be clearly indicated on the ground. The street was unimproved and almost impassable. The plaintiff's premises were uninclosed and unoccupied. As we said in *San Diego* v. *Hall,* 180 Cal. 165, [179 Pac. 889]: " . . . something more than a mere casual user must be shown before any valid dedication will be implied. The rule upon this subject—a rule to the measure of which appellant's testimony fails to reach—was well expressed by Mr. Justice Sloss, speaking for the court in Bank, in the case of *F. A. Hihn Co.* v. *City of Santa Cruz et al.,* 170 Cal. 436–447, [150 Pac. 62–68]: 'In order to constitute a valid dedication, there must be an intention on the part of the owner to devote his property to the public use. (*California Nav. Co.* v. *Union Transp. Co.,* 126 Cal. 433, [46 L. R. A. 825, 58 Pac. 936]; *Niles* v. *Los Angeles,* 125 Cal. 572, [58 Pac. 190].) It is true that this intent may be inferred from long acquiescence in a use by the public. (13 Cyc. 455.) But where land is uninclosed and uncultivated, the fact that the public has been in the habit of going upon the land will ordinarily be attributed to a license on the part of the owner, rather than to his intent to dedicate. (13 Cyc. 484.)' "

It is conceded that if none of that portion of Ohio Street extending through plaintiff's premises is a public street, that the assessment upon plaintiff's property is invalid and that the judgment should be reversed.

Judgment reversed.

Olney, J., Shaw, J., Lawlor, J., Lennon, J., and Angellotti, C. J., concurred.