[Civ. No. 3273. Fourth Dist. Feb. 15, 1945.]

CITY OF LAGUNA BEACH, Appellant, v. CONSOLIDATED MORTGAGE COMPANY (a Corporation) et al., Respondents.

Jack J. Rimel, City Attorney, for Appellant.

Ray H. Overacker, City Attorney (Huntington Beach), O. A. Jacobs, City Attorney (Santa Ana), Clyde Woodworth, City Attorney (Inglewood, El Segundo, South Gate, Manhattan Beach), Leo J. Friis, City Attorney (Anaheim), Elmer Guy, City Attorney (Brea), C. R. Allen, City Attorney (Fullerton), Roland Thompson, City Attorney (Newport Beach), Gordon X. Richmond, City Attorney (Orange), Glenn D. Newton, City Attorney (Redding), B. Z. McKinney, City Attorney (San Clemente), Dana William, City Attorney (Seal Beach), George E. Bradley, City Attorney (Tustin), Harold McCabe, City Attorney (La Habra), and Richard C. Waltz, City Attorney (Beverly Hills), as Amici Curiae on behalf of Appellant.

Mize, Kroese & Larsh for Respondents.

BARNARD, P. J.—This is an action to quiet title to an easement and right of way for public street purposes over and upon a strip of land 14 feet wide running along the ocean front in the city of Laguna Beach. This strip is entirely covered by a wooden sidewalk or boardwalk. The entire boardwalk along this ocean front is several blocks in length but the only portion involved in this action is that within the block lying between Ocean Avenue on the north and Laguna Avenue on the south.

This block consists of fifteen lots owned by the various defendants. As originally platted the lots faced east on El Paseo Street which, in a general way, parallels the ocean line. The lots were 25 feet wide and extended westerly toward the ocean a distance of 75 feet. This left a sandy beach of considerable width between the rear of these lots and the ocean shore. How they acquired title does not appear, but it was stipulated for the purposes of this action that the respective owners of these lots also owned in fee the land between the rear of their lots and the westerly line of the boardwalk, subject to the

question of the easement here claimed. The 14-foot strip in question curves somewhat, in accordance with the ocean line, and is between what may be called the beach and the westerly line of this block as originally platted. At Laguna Avenue on the south, the easterly line of the boardwalk is about 17 feet from the westerly line of the block as platted, and at Ocean Avenue at the north it is some 60 or 70 feet from that line.

It appears from the evidence that at least as early as 1902 there was a narrower boardwalk along this beach front, between Ocean Avenue and Laguna Avenue, in approximately the same location as the present walk. This walk was continuously used by the general public with the full knowledge of the owners of lots in this block, without objection on their part, and without permission being asked or obtained.

In 1925, the present walk was built following the line of the old walk in this block, with a slight variation, the width being increased to 14 feet. The new walk was made of 2 x 8 planks 14 feet long laid across five girders which rested on posts eight inches square, which were set in the sand. The cost of the walk was paid by prorate contributions made by the several property owners. At the same time the walk was extended across Ocean Avenue and on to the north for at least another block. It was also extended across Laguna Avenue to the south and a short distance farther into or along the grounds of a hotel. The city of Laguna Beach was not then incorporated and the county paid the cost of constructing this walk across the westerly ends of Ocean Avenue and Laguna Avenue. The walk was so constructed as to join with the sidewalks or walkways on those streets. The general public use of the new walk continued on an increasing scale from 1925 until this action was filed in 1942 with the full knowledge of the property owners and without any objection on their part.

The plaintiff city was incorporated in 1927. Beginning in 1933, and continuously since that time, employees of the city, under the direction of the city engineer and superintendent of streets, have at regular intervals inspected this boardwalk, replacing worn or damaged understructure and surface planks, constructing handrails and stairways leading from the surface of the walk to the sandy beach, and making minor repairs. This has been done with knowledge of the property owners and without either their permission or objection. Several of

the property owners have also made minor repairs during this time, consisting mainly of driving down loosened nails and placing tin strips over knot holes. Since 1935 benches have been kept on the boardwalk facing the beach, which were generally used by the public. It does not appear who first placed benches there but since 1940 city-owned benches have been placed along the walk.

It would serve no useful purpose to summarize the evidence of the respective witnesses. The evidence shows, without conflict, that this boardwalk was continuously used by the general public for some forty years; that its use has largely increased since it was rebuilt and widened in 1925; that many of the lot owners or their tenants have constructed or placed business structures and established businesses along the boardwalk between its easterly line and the westerly line of the original lots as platted; that the walk has been used to attract customers to these businesses as well as by the general public; that while the number of people using the walk is larger in the summer season such use is continuous throughout the year; that such use has been with the knowledge of the lot owners and with their encouragement; that specific permission for such use has never been asked or given; that no objection to such use has ever been made; and that except in connection with one lot owner, which matter will be hereafter referred to, no sign or notice of any kind has ever been posted along this boardwalk to notify the public that use thereof was permissive only.

Several of the defendants testified that at the time they contributed to the reconstruction of the walk in 1925 they had no intention of dedicating their portion of the land it occupied to public use; and that they were willing to contribute their share of the expense because they believed it would "increase the convenience," increase "business," and increase "the rental or income value" of their property. There was also evidence that during later years the areas between the westerly lot lines, as originally platted, and the ocean were added to the description of the respective lots on the tax rolls. Admittedly, no extra taxes were assessed or collected because of this fact.

The court found in favor of the plaintiff as to all defaulting lot owners and in favor of all defendants who filed answers. No findings were made as to any specific facts. the findings

and conclusions of law being identical and to the effect that the plaintiff is not entitled to any easement or right of way for public street purposes over, along or across those portions of the 14-foot strip of land and boardwalk running across the parcels of land owned by the appearing defendants, and that these defendants are, respectively, the owners in fee of these portions of the 14-foot strip of land and boardwalk. In a written opinion the trial judge pointed out the general rule that "the law will imply an intention to dedicate, even though such dedication is not explicitly stated, where there has been over a long period of time acquiescence by the record title holder in the use of land for highway purposes," and that the subsequent use of the road or way by the public operates as an acceptance of the dedication when the facts indicate a setting apart of the land by the owner for the use of the public. It was then pointed out that long continued use by the public here appears and that the owners at all times had knowledge of this use and acquiesced in it. It was then stated that several cases laid down the rule that mere use alone does not disclose an intention to dedicate and that where an alleged dedication rests upon acts and conduct alone the intent to dedicate must clearly appear. The court then said that the presumption of dedication arising from long continued use without objection should be applied only where there are no facts which are inconsistent with an intention to dedicate, that a doubt appeared here with respect to such an intention since the walk was built at the expense of the property owners, since they made some of the later repairs which became necessary, and since the strip of land upon which the walk is located had been assessed to them, and that this doubt should be resolved in favor of the property owners. Judgment was entered accordingly, and the plaintiff has appealed from that portion of the judgment which was in favor of the answering defendants.

The appellant relies on such cases as *Schwerdtle* v. *County of Placer*, 108 Cal. 589 [41 P. 448]; *Hartley* v. *Vermillion*, 141 Cal. 339 [74 P. 987]; *People* v. *Myring*, 144 Cal. 351 [77 P. 975]; *Whiteman* v. *City of San Diego*, 184 Cal. 163 [193 P. 98]; *Hare* v. *Craig*, 206 Cal. 753 [276 P. 336]; and *Diamond Match C.* v. *Savercool*, 218 Cal. 665 [24 P.2d 783]. In the last of these cases, the general rules are thus stated:

"To constitute a valid and complete dedication there must

be an intention by the owner, clearly indicated by his words or acts, to dedicate the lands to public use (*City of Venice* v. *Short Line Beach L. Co.*, 180 Cal. 447, 450 [181 P. 658]), and an acceptance either by public user or formal resolution. (*Brown* v. *Bachelder*, 214 Cal. 753 [7 P.2d 1027].) The intention to which courts give heed is an intention manifested by the owner's acts and finding expression in his conduct. (*City of Los Angeles* v. *McCollum*, 156 Cal. 148 [103 P. 914, 23 L.R.A.N.S. 378].) It may be either express or implied, and is implied when the acts and conduct of the owner indicate clearly an intention to devote the land to the public use. (*People* v. *Myring*, 144 Cal. 351, 354 [77 P. 975].) The law will imply an intention to dedicate from long acquiescence in the use of land for highway purposes, for it is settled that the common-law rule as to the presumption of dedication by adverse user is applicable in this state. (*Schwerdtle* v. *County of Placer*, 108 Cal. 589, 592 [41 P. 448].) . . .

"Of course, where the dedication of a highway is sought to be established by user, it must be shown that the user was adverse, continuous and with the knowledge of the owner, for the required period of time. (*City of San Diego* v. *Hall*, 180 Cal. 165, 168 [179 P. 889].) So far as the element of time is concerned, periods varying from five to forty years have been held sufficient. (*Plummer* v. *Sheldon*, 94 Cal. 533 [29 P. 947] ; *Barnes* v. *Daveck*, 7 Cal.App. 487 [94 P. 779].) The adverse character of the use and the knowledge and acquiescence of the owner may be inferred from circumstances, and long-continued adverse user establishes against the owner the conclusive presumption of knowledge and acquiescence."

In *Barnes* v. *Daveck*, 7 Cal.App. 487 [94 P. 779], in commenting on what is required to show adverse use, the court said:

"There are presumptions arising from certain facts which are conclusive and obviate the necessity for direct evidence to the point. It is not always necessary for the public, in using a roadway, to make proclamation that they are using it under a claim of right where the right is asserted as flowing from long usage with the knowledge and acquiescence of the owner of the land; nor is it always necessary to show some aggressively hostile act by the public that such use was intended to be adverse to the owner. The claim of right, the adverse character of the use and the knowledge and acquiescence of

the owner of the land may be presumed from the facts and circumstances attending the use.''

The respondents rely on *People* v. *Sperry,* 116 Cal. 593 [48 P. 723]; *San Francisco* v. *Grote,* 120 Cal. 59 [52 P. 127, 65 Am.St.Rep. 155, 41 L.R.A. 335]; *Burk* v. *City of Santa Cruz,* 163 Cal. 807 [127 P. 154]; *Clarke* v. *Clarke,* 133 Cal. 667 [66 P. 10]; and *Lyons* v. *Schwartz,* 40 Cal.App.2d 60 [104 P.2d 383]. In these cases it was held either that there was no showing of general public use, that such use was merely permissive, or that any showing of use was not sufficient to compel a finding of dedication.

In *Lyons* v. *Schwartz, supra,* it was pointed out that in order to prove dedication much stronger evidence is required with respect to a country roadway than in the case of a street in a town or city. As was said in *F. A. Hihn Co.* v. *City of Santa Cruz,* 170 Cal. 436 [150 P. 62], ''But where land is uninclosed and uncultivated, the fact that the public has been in the habit of going upon the land will ordinarily be attributed to a license on the part of the owner, rather than to his intent to dedicate.'' The matter of the manner in which the property is assessed on the tax rolls under such circumstances as here appear is immaterial on the question of implied dedication. (*Burk* v. *City of Santa Cruz,* 163 Cal. 807 [127 P. 154]; *Manhattan Beach* v. *Cortelyou,* 10 Cal.2d 653 [76 P.2d 483].)

In determining whether the use shown indicates an acceptance of an implied intention to dedicate to public use or whether it is merely permissive, the rules laid down and some of the broad statements made in the various decisions must be considered in the light of the facts in each case. Obviously, the surrounding circumstances affect the nature and extent of the rule which is to be applied in a particular case. Naturally, more evidence of an intent to dedicate to public use is required in an open country where the public has been in the habit of going at will, without any clearly defined roadways. Even in cities and towns different circumstances call for different rules. It should take stronger evidence to show an implied dedication where people have cut across a vacant lot as a matter of convenience, and the general circumstances indicate that neither the owner nor the public ever intended to establish a road there. On the other hand, a deliberate action on the part of all of the owners in a certain area for the pur-

pose of bringing the general public into and through that area and providing them with a fixed route and permanent roadway is a different matter and naturally gives rise to presumptions which cannot be overlooked.

The respondents argue that in all the cases in which a dedication has been upheld something other than ''mere use'' has appeared. In other words, that in these cases there was evidence of some act by the owner to indicate his willingness that the property be dedicated to public use. Assuming this to be true, rather convincing evidence of such acts here appears. Originally, there was no street or public way of any kind between the rear of these lots as platted and the ocean. As the use of the beach for recreation purposes increased a potential source of business for the property owners naturally developed. The fact that the nature of the traffic to be expected was pedestrian, rather than vehicular, is not important. As early as 1902 a considerable effort was made to accommodate and encourage such traffic in this particular block. In 1925, the property owners united for the purpose of improving and enlarging the facilities theretofore offered to the public and united with property owners in other blocks in extending the scope of the improvement in order to extend and increase its public use. In doing this the walk was also constructed across and beyond two public streets in such a manner as to attract pedestrian traffic from those streets. The county was induced to pay the cost of the walk across the ends of these streets and this indicates that the portion of the walk within those streets was considered as a public way and a part of the streets. If those parts of the walk were considered as a public way this fact suggests that the entire walk, built at the same time and for the same purpose, must have been so considered. The lot owners not only permitted and thus invited the general public to make use of this strip of land, but they improved it for that purpose with an expensive structure, which is comparable in nature and effect to the pavement of a street which would be appropriate in a different kind of location. The fact that the property owners paid for this improvement is, under the circumstances, suggestive of their willingness to dedicate the strip to public use rather than of a desire to retain it as private property. It was made a community affair for lot owners in that area all of whom were similarly situated, and they all participated in the common enterprise for the purpose of increasing the rental

or income value of their respective properties by inducing a larger public use of this way. The city was not then incorporated, it would have been difficult to get the county to make so expensive an improvement, and the fact that the property owners were willing to unite and improve this strip for the purpose of inducing the public to use it in the manner contemplated strongly indicates an intention to make it a public way, rather than one to limit to some permissive and temporary use. It also appears that since the reconstruction of the walk many businesses have been established along its easterly side in this block and at least one on the west side, to take advantage of the public use thus invited. One of the lot owners who promoted the project in 1925, and who raised the money for the improvement, testified that he collected all of the money in advance ''because I had been stuck on one or two streets, oiling propositions of that kind.'' After the walk was reconstructed some of the lot owners made small repairs thereon, and after the city was incorporated the city employees made more extensive repairs and some improvements without any objection from the property owners who knew that this was being done.

These facts show something more than a mere use, such as occurs when some part of the general public begins to cross a vacant lot without permission of the owner. There was here not only knowledge on the part of the owners but an invitation and actual encouragement to a continued use by the public which is inconsistent with any idea that it was intended to be temporary and merely permissive. The fact that such a way is prepared at great expense for the very purpose of attracting the public and inducing them to travel that way in order to bring business and increased rental value to all of the parcels in a considerable area is very strong evidence of an intent to dedicate it to public use. Few, if any, of the cases cited disclose so clear an intention and willingness to dedicate property to public use as here appears.

Not only do these facts clearly disclose an intention on the part of the lot owners to dedicate this strip to public use and an acceptance thereof by such use for many years, but there is no substantial evidence to indicate a contrary intention on the part of the lot owners. Some of them testified that when they contributed to the project in 1925 it was not their intention to dedicate the land to public use. This may be literally true since, in practical effect, the land for the walk had been

so dedicated and used by the public for some twenty-five years at that time. What was then done was to improve and widen the existing way through that block, and to extend it to serve a larger area in order to increase its use by the public, and the property owners may not have consciously considered the matter of dedication. In any event, their actions then and through the following years are such as, under the authorities above cited, to raise a presumption of intention to dedicate which cannot be dispelled by their self-serving and incomplete testimony that they had no such specific intention while the improvements were being made in 1925. Whatever their intention at that time, their intention to dedicate this walk to public use sufficiently appears by their acts and conduct through the many years preceding the filing of this action, with one exception which will be next referred to.

A somewhat different situation appears with respect to the lots owned by the respondents N. E. West and Agnes Y. West. They own three lots and ten feet of another lot at the southerly end of the block in question, being the portion of this block which is nearest Laguna Avenue. Mr. West testified that shortly after the new walk was constructed in 1925, he placed a wooden sign on the inside or easterly line of the boardwalk on this property and about twenty feet northerly from Laguna Avenue; that the sign read "Private Property —Right to Pass Over Revocable by Will of Owner"; that this sign disappeared after a time and he put up a second sign; that this disappeared and he put up a third, which later disappeared; that these signs were in that position over a period of several years; and that he did not think there had been any such sign there during the last seven years. Mrs. Fisher testified to the same effect; that she had seen such a sign in front of the West property over a period of several years. However, on cross-examination, she was led on until she finally said that one of these signs had remained in that position up to "about three years ago." While it seems probable she was mistaken, her evidence is very definite and the trial court had the right to accept it as true. Under these circumstances and if such a sign was in that position from 1925 up to some two years before the action was filed, this fact is sufficient to support the court's finding and judgment with respect to the property owned by the respondents West.

For the reasons given, that portion of the part of the judg-

ment appealed from which is in favor of the respondents West is affirmed. The remaining portions of that part of the judgment appealed from are reversed, with directions to the trial court to make the appropriate findings and to enter a judgment in favor of the appellant as against all of the respondents except the Wests.

Marks, J., and Griffin, J., concurred.