[Civ. No. 14385.   First Dist., Div. One.   Jan. 26, 1951.]

THE PEOPLE, Respondent, v. JOHN SAYIG et al.,
Appellants.

Rea, Jacka & Frasse and J. E. Bean, Jr., for Appellants.

Holloway Jones, Jack M. Howard, Joseph F. DeMartini, Roger Anderson, John P. Horgan and Robert E. Reed for Respondent.

PETERS, P. J.—The state brought this proceeding in eminent domain to condemn, for highway purposes, defendants' interests, if any, in a 15-foot strip of land fronting defendants' properties. Admittedly, defendants have title to the underlying fee of the strip in question. The complaint, as amended, alleged that all of the property sought to be condemned "is subject to an easement or prescriptive right of the public for public travel thereover by vehicular and pedestrian traffic." The trial court found this allegation to be true, and further found that the bare fee title, subject to

the public easement, was of no value. The court also found that none of the defendants suffered any damages to the remainder of their properties by the changes made in the highway by the new improvement. The defendants appeal. They admit that they offered no evidence of the value of the underlying fee subject to the easement, and admit that the findings that their underlying titles, if they are subject to the easement, are of no value, are supported. They contend, however, that the findings that there was a public easement for highway purposes over the strip are totally unsupported by any evidence. They further urge that, regardless of the questions involving the 15-foot strip, the changes made in the highway have substantially impaired their right of access to their remaining lands, and they claim that they are entitled to compensation for this impairment.

The 15-foot strip which was taken for highway purposes extends across the front of the five pieces of commercial property owned by defendants. These properties are located on the El Camino Real in Sunnyvale near the junction of El Camino Real with the Sunnyvale-Saratoga Road. El Camino Real is one of the main highways between the cities of San Francisco and San Jose, and has existed substantially in its present location for many years. It runs generally north and south, but in the area here involved runs substantially east and west. The five pieces of property owned by defendants are located on the north side of the highway, and on each lot the respective owner operates a commercial establishment. Fronting each lot is a 15-foot strip, title to which is in the owner of the lot to which the strip is adjacent. The parties, for purposes of convenience at the time of trial, divided this strip into five parcels and designated them as parcels one, two, three, four and five. The lots behind each parcel will be designated as lots one, two, three, four and five. Parcels and lots one, two and three are contiguous and extend between Taaffe Street and Frances Street, two streets that join El Camino Real from the north. Parcels and lots four and five are contiguous and are located across Frances Street to the east of parcels and lots one, two and three. Between the lots and parcels there is a cement curb and gutter.

El Camino Real, certainly since 1910, and probably from a much earlier date, has run past the properties here involved. Originally, the highway was a two-lane paved highway 20 feet in width, and subsequently it became a three-lane paved highway. Adjoining the highway to the north was a shoulder which was oiled and gravelled. The 15-foot strip adjoins

this shoulder, then (since 1926) comes the curb and gutter, and then defendants' lots. There is evidence that from the center of the highway to the curb line was about 50 feet. The present improvement relocates the highway in certain respects, and in front of defendants' lots makes the highway a divided highway, so that such lots have direct access only to a one-way highway in front of their properties where the traffic is proceeding towards San Francisco. To get to the one-way highway to go to San Jose defendants have to travel various distances from 500 to 1,000 feet to the crossover. Under the new improvement, the 15-foot strip becomes an integral part of the one-way highway on which the traffic is travelling towards San Francisco.

Prior to 1925 the lots and parcels of defendants were part of an orchard abutting the highway and its shoulder. There is some evidence that prior to 1925 some automobiles occasionally travelled along the 15-foot strip to avoid the heavy traffic on the highway and its adjacent shoulder. There is also substantial evidence, however, that prior to 1925 the strip was covered with fruit trees, and admittedly was covered with weeds. Prior to 1926 there was no physical division between the parcels and lots. In 1925 the orchard was subdivided and the trees removed. The subdivider, in 1926, saw fit to construct a six-inch high cement curb and a gutter between the lots and the strip in question. Later a sidewalk was constructed in front of several of the lots and behind the curb line. Thus, since 1926, there has been a physical barrier between the lots and the parcels constituting the strip here involved. The original deeds to the subdivided area which carried title to the parcel fronting each lot contained a restriction against using the front 25 feet of the property for building purposes, but this restriction died in 1936.

Shortly after the property was subdivided the subdivider gravelled the 15-foot strip, and later permits were granted to the owners of several of the lots here involved to oil the parcel in front of their lots. After this was done the 15-foot strip, physically, was simply a continuation of the surfaced shoulder and indistinguishable from the shoulder.

Gradually, after the orchard was subdivided in 1925, the various lots here involved became improved with various types of commercial buildings. Before buildings were constructed on all of the lots here involved there is some evidence that some substantial amount of traffic travelled up and down the 15-foot strip to avoid the heavy travel on the main high-

way and its adjacent shoulder. As the area developed commercially the strip more and more came to be used for parking purposes, and it was so used until it became part of the new development of the highway. There is substantial evidence that the parking was public parking and was unrestricted.

A brief description of each parcel and lot follows:

*Parcel and Lot One:*

These are owned by John Sayig. In 1935 a grocery store was constructed on the lot, and since that time the parcel in front of the lot has been used primarily for diagonal parking.

*Parcel and Lot Two:*

These are owned by Clarence Kay. There was a great deal of evidence introduced as to the use of these properties. Part of this lot was unimproved. On this unimproved portion Kay displayed motor vehicles and farm equipment for sale. The balance of the lot was used by Kay for a garage and service station. The portion of the parcel in front of the unimproved part of the lot was sometimes used by Kay to display his equipment, but there is substantial evidence that several times a state highway official demanded that Kay remove such equipment from the strip, and that Kay always removed the equipment upon demand. The parcel in front of the garage and service station was sometimes used by Kay for the purpose of parking cars while batteries were checked, etc. Kay commenced his business on this lot in 1937. In 1938 at the east end of the parcel there was constructed a Texaco sign which was erected on a concrete abutment or platform about 20 inches high. This abutment was about two feet wide at the highway end and bigger on the lot side. This abutment ran from the buildings on the lot and across part of the parcel in front of the lot. There is evidence that this abutment ran a little more than halfway across parcel two, which means that it ran 8 to 10 feet across the 15-foot strip.

*Parcel and Lot Three:*

These were purchased by Kay in 1948, about a year before the trial. Since 1931 the lot has been used for restaurant purposes, and parcel three has been used primarily for diagonal parking.

*Parcel and Lot Four:*

In 1930 or 1931 a fruit stand was built on this lot. Later

a lunch stand was added and the building gradually became a restaurant, which it is today. Parcel four is used primarily for parking purposes. These properties are owned by Peter Pangracs.

*Parcel and Lot Five:*

These are owned by Rufino Yglesias. The building on the lot, constructed in 1928 or 1929, harbors a barbershop, a bus depot, a restaurant and a taxi stand. Busses and taxis parked on parcel five.

The state contends that its evidence supports the finding that a public easement for highway purposes—i. e., a dedication by the owners and an acceptance by the public—attached long before the properties were fully improved. The state produced substantial evidence that prior to the building of the present improvements on the lots the witnesses could, did, and saw others drive over the 15-foot strip. This travel over the strip existed before the orchard was subdivided in 1925, but certainly has existed since the construction of the curb and gutter in 1926, and the gravelling of the area in 1927 or 1928. Since the property has been improved the strip has been used primarily for parking. The evidence on the part of the state supports the inference that such parking was public unrestricted parking, and not limited to customer parking.

In addition to this testimony of use the state produced some other evidence which it claims supports the conclusion that the property owners, or some of them, recognized that the state controlled the strip in question. Lawrence Robinson, the assistant maintenance district engineer of the state and formerly maintenance superintendent of the San Jose territory, testified that in 1938 the owner of parcel five applied to the state to improve the parcel in front of his property from the curb line out, by oiling the surface. This request was denied, but permission was granted the owner to improve the surface at his own expense. The owner of parcel three, in 1941, filed an application to improve the surface of the strip in front of lot three, which application was granted. Obviously, if the strip was not subject to a public easement, and if the owners of parcels three and five claimed to be the absolute owners of the parcels, there was no necessity of applying to the state for permission to gravel or otherwise improve the parcels. Such actions certainly support the inference that these owners recognized an interest in the state in the parcels in question.

Laird Geddes, a state highway engineer, testified that on several occasions he asked Kay to remove his vehicles displayed for sale on parcel two, and that Kay complied with these requests. He also testified that on one occasion he asked Kay to remove gravel from the gutter in front of the curb between lot and parcel two because it was obstructing the flow of water, and Kay had done so. He also testified that the state had granted permission to Kay to install a water drainage pipe in the gutter. Such actions, of course, support an inference that Kay recognized an interest of the state in the strip in front of his lot.

The parties to this appeal agree as to the applicable law, but differ as to the application of that law to the facts.
■ The trial court referred to the public acquiring an "easement by prescription" in the strip in question. Technically, that is not correct. If the public did acquire any right to the use of the strip for highway purposes, such right was acquired under the doctrine of implied dedication and not by prescription. (See 9 Cal.Jur. p. 41, § 32.) A public easement arises only by dedication. But adverse user by the state for the prescriptive period—five years—may be evidence of a dedication, and many of the rules applicable to private easements are applicable to public easements. The case of *Venice* v. *Short Line Beach Land Co.*, 180 Cal. 447 [181 P. 658], presents a good summary of the various principles applicable to the law of implied dedication. At page 450 these principles are summarized as follows: "In order to constitute such dedication, or such abandonment, by the owner, his intention to that effect must appear. Such intent need not be manifested by any contract, writing, or express declaration of the owner. It may be implied from his conduct. 'If the donor's acts are such as to indicate an intention to appropriate the land to the public use, then, upon acceptance by the public, the dedication becomes complete.' (*People* v. *Marin County*, 103 Cal. [223] 228, [26 L.R.A. 659, 37 P. 203].) In that case it is said that in the case of an express dedication by words or acts, 'the intention to appropriate the land to public use is manifested by some outward act of the owner manifesting his purpose,' but that an implied dedication may be proved 'by acts or conduct not directly manifesting the intention, but from which the law will imply the intent.' As stated in *Helm* v. *McClure*, 107 Cal. [199] 204, [40 P. 437], the question 'whether a dedication of land for highway purposes has occurred in any instance is a conclusion of fact to be drawn from

the circumstances of the particular case; that such circumstances must clearly show an unequivocal intention, manifested by appropriate words or conduct, or both, on the part of the owner, to devote his land to the wayfaring uses of that somewhat vague entity called "the public." ' [Citing cases.] It is not necessary that the acceptance by the public be manifested by any direct action, ordinance or declaration of the public authorities. 'Such acceptance may be shown by mere user without any formal action in relation thereto by the municipal authorities.' (*Monterey* v. *Malarin*, 99 Cal. [290] 293 [33 P. 840].) 'The use of the street by the public for a reasonable length of time,' is sufficient evidence of acceptance. (*Smith* v. *San Luis Obispo*, 95 Cal. [463] 470 [30 P. 591].)'' (See, also, cases collected and commented upon in 9 Cal.Jur. p. 45, § 35.)

In *Barnes* v. *Daveck*, 7 Cal.App. 487, 491 [94 P. 779], the proper rule is stated as follows: ". . . where prescriptive title to land is claimed, it has been said that the hostile possession must be open and notorious and with intent to usurp the place of the true owner and put him out of possession [citing a case]; but the rule as to highways requires only such adverse use and occupation as is inconsistent with the owner's right to claim the exclusive use of the land; i. e., such adverse use as carries with it the assertion of an equal right by the public to use the highway."

There is a general presumption that a use by other than the owner is adverse and not permissive. While this presumption is not as strong when the land is open and uncultivated and remote, as when it is enclosed, cultivated and developed (*F. A. Hihn Co.* v. *City of Santa Cruz*, 170 Cal. 436 [150 P. 62]; *Whiteman* v. *City of San Diego*, 184 Cal. 163 [193 P. 98]; *City of San Diego* v. *Hall*, 180 Cal. 165 [175 P. 889]; *Schwerdtle* v. *County of Placer*, 108 Cal. 589 [41 P. 448]), the presumption exists in either case. The problem is one of fact for the trial court. (See *O'Banion* v. *Borba*, 32 Cal.2d 145, 149 [195 P.2d 10]; *Weideman* v. *Staheli*, 88 Cal. App.2d 613, 616 [199 P.2d 351]; *Pratt* v. *Hodgson*, 91 Cal. App.2d 401, 404 [204 P.2d 934].)

Tested by these standards we think that the evidence supports the findings that a public easement over the strip attached. Appellants argue that the evidence would not support a finding that there was an implied dedication prior to 1925. While there is some evidence of public travel over

the strip prior to that date, such evidence is not very satisfactory. There is substantial evidence, including that of the farmer who operated the orchard, that, prior to the subdivision, trees grew on the strip and that it was impassable. However, the state does not have to rely upon the public easement having come into existence prior to 1925. There is ample evidence to support the conclusion that a public easement came into existence after 1925.

Appellants argue that any use of the strip made by the public after the buildings were constructed on the lots was permissive and not adverse. · It is urged that the evidence shows that the owners of the lots and parcels used the strip for their own convenience. Great emphasis is placed on the admitted fact that the Texaco sign was erected and the abutment constructed across half or more of the strip in front of lot two. That sign was not erected until 1938, and, as the state correctly points out, the evidence shows that the public easement was acquired long before that date. ■ Of course, once the public easement for highway purposes attached, title by adverse possession could not be acquired against the state. (*Hoadley* v. *San Francisco*, 50 Cal. 265; *People* v. *Pope*, 53 Cal. 437; *County of Sacramento* v. *Lauszus*, 70 Cal.App.2d 639 [161 P.2d 460].) The evidence shows that an adverse use commenced about 1926, and long before 1938 had continued long beyond the required five-year period. The evidence that vehicles displayed for sale were placed on the strip by the owner of lot two also deals with acts after 1935. Moreover, there is evidence that this owner, upon demand of highway employees, removed these vehicles. ■ The portion of the strip in front of lot five used as a taxi stand and bus stop is certainly not inconsistent with that parcel being part of the highway. Appellants also urge that most of the strip was used for customer parking and for parking by the owners and their employees. The evidence, while in conflict, supports the inference that the parking was public unrestricted parking. Appellants seem to argue that even if there was public unrestricted parking, that would not create a public easement for highway purposes because the parked cars prohibited public travel over the strip. ■ It is too clear to require further discussion that the portion of a street or highway used for public parking is as much devoted to a highway or street use as the portion over which vehicles travel.

Appellants also place much reliance on certain signs erected

by the owners of the lots, and urge that these signs show that any use by the public for parking was permissive and not adverse. The evidence as to these signs is not very clear. The sign adjacent to parcel one was on a watermelon stand built on a portion of lot one, and purported to reserve some area for the parking of customers of the stand. It is by no means clear from the evidence whether the space reserved for customers was inside the lot or on parcel one. Certainly, the evidence is susceptible of the inference that a portion of lot one and not parcel one was reserved for customers. The sign on parcel two read "No parking behind this point, keep driveway clear," and in 1938 was attached to the Texaco sign. Later, exactly when is not clear, the sign was moved and attached to the building on the lot. It must be remembered that these signs were erected after the public easement had attached. ■ Even if they had been erected prior to that time they would only be a factor to be considered and would not be conclusive on the issue of permissive or adverse use. (*Pratt* v. *Hodgson*, 91 Cal.App.2d 401, 405 [204 P.2d 934].)

■ The general picture we get from the record is this: Since 1910, and probably prior thereto, the strip has been within or on the boundary of the highway. Prior to 1925, it is most difficult to ascertain the precise boundaries of the travelled area. Then in 1926, all doubt of the area intended to be included by the owners within the highway area was set at rest. The construction of the uniform curb and gutter in front of these properties removed all doubt. It is apparent that it is, to say the least, a reasonable inference that the subdivider intended that the strip should thereafter be part of the highway and should be used for travel and parking. A short time later the subdivider graded and gravelled the strip, thus making it an indistinguishable part of the shoulder adjacent to the paved highway. It is no answer to say that such actions are also consistent with an intent to reserve the strip for parking, for public parking is a highway use. After the strip was gravelled there was no physical feature to indicate any reservation for permissive use—in fact, the physical setup indicated, if it did not demonstrate, that the strip was part of the highway. This supports the finding of intent to dedicate. Public use and acceptance for far longer than the five-year period are also shown by the evidence already summarized. It follows that insofar as the judgment determines

the existence of a public easement over parcels one, two, three, four and five, it must be affirmed.

The second major contention of appellants involves claimed compensable damages because, so it is averred, the appellants' right of access to their respective lots has been materially impaired by the improvement. Prior to the present improvement the old highway had three lanes. Traffic travelling in either direction on this highway as it then existed could turn directly from the highway proper to any of appellants' commercial establishments. The precise nature of the present improvement is somewhat difficult to describe. While lots four and five are somewhat differently affected than lots one, two and three, for practical and legal purposes it can be stated that the highway is now physically divided in front of the properties, so that there is one highway with traffic flowing towards San Jose, and a separate highway, divided from the other by an impassable "island," with traffic flowing from San Jose. So far as lots one, two and three are concerned, the new improvement in no way affects traffic proceeding towards San Francisco. As to those three lots, such traffic has direct access to the establishments operated by the owners. This is also substantially true as to lots four and five, although some slight circuity of travel is required for San Francisco-bound traffic to reach those lots. None of the lots has direct access to the traffic lane where the traffic is proceeding south towards San Jose. Because of the center dividing strip, any vehicle travelling south towards San Jose that desires to reach any of appellants' lots has to travel past appellants' properties 500 to 1,000 feet, to where there is a crossover to the San Francisco traffic lane and proceed back to the properties. It is appellants' theory that by thus putting their properties on a one-way street, their rights of ingress and egress in one direction have been materially impaired, and that this constitutes a compensable injury. (For a general discussion of the problem see 32 Cal.L.Rev. 95; 18 So.Cal.L.Rev. 42; note in 100 A.L.R. 491.)

In contending that they are entitled to damages for this impairment of their right of access, appellants cite and place their sole reliance on the rules announced in *People* v. *Ricciardi*, 23 Cal.2d 390 [144 P.2d 799]. In that case the defendants owned busines property on a main highway. The state constructed an underpass directly in front of defendants' property. Direct access to the main highway was entirely cut off, but a service road was constructed for the use of the property. The Supreme Court held that the damage to

the right of ingress and egress was compensable. In so holding, the court stated several important principles:

1. "Not every depreciation in the value of the property not taken can be made the basis of an award of damages." (P. 395.) The court pointed out (p. 396) that the injury to the business of the occupant of the property is not compensable. Only damage to the property itself may be considered. The court then held, citing *Rose* v. *State of California,* 19 Cal.2d 713 [123 P.2d 505]; *People* v. *Gianni,* 130 Cal.App. 584 [20 P.2d 87]; *City of Stockton* v. *Marengo,* 137 Cal.App. 760 [31 P.2d 467], that "an abutting owner has no right to compensation by reason of diversion of traffic away from his property." (P. 396.)

2. The court then cited many cases in support of the rule that the abutting owner has the right to a free and convenient right of access to the highway on which his property abuts. This right of ingress and egress attaches to the lot and is a property right as fully as the lot itself.

3. At page 399 it is stated: "We recognize that the defendants have no property right in any particular flow of traffic over the highway adjacent to their property, but they do possess the right of direct access to the through traffic highway and an easement of reasonable view of their property from such highway. If traffic normally flowing over that highway were re-routed or if another highway were constructed which resulted in a substantial amount of traffic being diverted from that through highway the value of their property might thereby be diminished, but in such event defendants would have no right to compensation by reason of such re-routing or diversion of traffic. The re-routing or diversion of traffic in such a case would be a mere police power regulation, or the incidental result of a lawful act, and not the taking or damaging of a property right. But here we do not have a mere re-routing or diversion of traffic from the highway; we have, instead, a substantial change in the highway itself in relation to the defendants' property; i. e., a re-routing of the highway in relation to defendants' property rather than a mere re-routing of traffic in relation to the highway. Defendants' private property rights in and to that highway are to be taken and damaged. It is only for such private property rights that compensation has been assessed. The court allowed no damages to be predicated on any diversion of traffic from the highway but it did properly

allow damages to be based on diversion of the highway from direct access to defendants' property.''

4. It is for the trial judge, not the jury, to determine whether the property owner's right of access is substantially impaired. If such an impairment is found, then the extent of the impairment is for the jury.

Another case that appellants might have cited in support of these same general principles is *Bacich* v. *Board of Control*, 23 Cal.2d 343 [144 P.2d 818], which holds that a property owner suffered compensable damage when, as a result of a public improvement, his property, which was formerly located on a street running in both directions in front of his property became located in a cul-de-sac—i. e., ingress and egress to the next intersecting street in one direction was cut off.

The question with which we are presented is whether the rule of these cases should be extended to a situation where the highway runs past the property in both directions but, traffic is permitted to flow only in one direction. There is undoubtedly language in the Ricciardi and Bacich cases that supports the contentions of appellants in the instant case, and the rule of those cases could easily be extended so as to apply to the situation here presented.

However, those cases recognize that diversion of traffic or mere circuity of travel, even where they result in impairment of value, are not compensable. Those cases also recognize that where an owner locates his business on a main highway and secures his main business from traffic travelling on the highway, and the state changes the highway route so that his property is no longer located on a main highway so that the business of the owner is totally destroyed, the resulting damage is not compensable. We also know that the state, under its police power, may regulate traffic without becoming liable for damages for impairment to businesses that may be adversely affected. It may create freeways or limited access highways and relocate existing highways, without conferring the right to damages on property owners adversely affected. (*Holloway* v. *Purcell*, 35 Cal.2d 220 [217 P.2d 665].) If a property owner is entitled to compensation because a divided highway is constructed in front of his property, then the same result would logically follow when one-way streets are created in cities to control traffic, or even where a double white line is placed in a highway which prohibits traffic from crossing that lane lawfully, and thus permits only one-way traffic in front of the property. The Vehicle Code abounds with other regulations that result in permitting the property

owner to proceed only in one direction when emerging from his property.

While it might be argued that the rules of the Ricciardi and Bacich cases should be extended so as to apply to the factual situation here involved, it is obvious that those cases do not necessarily control the factual situation here presented. The degree of impairment of the right of access was greater in those cases than in the instant one. The nature of the impairment is different. We are not without authority on the precise point involved. In *Holman* v. *State of California,* 97 Cal.App.2d 237 [217 P.2d 448] (hearing denied by the Supreme Court), a divided highway was constructed. Plaintiffs' property was located on this highway, but, because of the divided highway, northbound traffic was entirely cut off from plaintiffs' property. Such traffic, in order to reach plaintiffs' property, had to proceed to a crossover located a considerable distance from plaintiffs' property. Plaintiffs operated on their property the business of servicing trucks and highway equipment. They contended that they were entitled to damages occasioned by the building of the dividing strip which interfered with their access to their property. They also alleged that vehicles leaving their property could no longer make an immediate left-hand turn and proceed north, which resulted in a depreciation of the reasonable market value of the land. The court held that plaintiffs were not legally damaged. It distinguished the Ricciardi case on the ground that in the Holman case, the plaintiffs had access from every point on their property to the highway. The Bacich case was distinguished on the ground that that case involved the creation of a cul-de-sac. Many other cases were also cited and discussed (pp. 241-242). The court stated, in the Holman case (p. 241) : ''In all of the foregoing cases in which it was held that compensation must be paid there was either physical injury to an owner's property itself, as in the Reardon case, or a physical impairment of access from the property to the street, whether caused by change of grade . . ., or by physical impairment of the property to the street by the means of the construction of a physical barrier as in the McCandless case, or by removing the property from the through highway and placing it on a side or service road as in the Ricciardi case, or by the creation of a dead end street as in the Bacich case. None of these cases involve the division of a highway into separate roadways by concrete islands or division strips and all are factually different from the case at bar.''

The court (p. 242) cited, with approval, the following passage from *Beckham* v. *City of Stockton,* 64 Cal.App.2d 487, 502 [149 P.2d 296]: " 'Regulations such as the prescribing of one-way traffic or the prohibiting of left-hand turns may interfere to some extent with right of access without furnishing a basis for recovery of damages even by an abutting owner. (See note, 100 A.L.R. 487, 491-493.) In *Eachus* v. *Los Angeles etc. Ry. Co.* [103 Cal. 614 (37 P. 750, 42 Am.St.Rep. 149)], *supra,* the court said: "The damage for which compensation is to be made is a damage to the property itself, and does not include a mere infringement of the owner's personal pleasure or enjoyment. Merely rendering private property less desirable for certain purposes, or even causing personal annoyance or discomfort in its use, will not constitute the damage contemplated by the constitution; . . ." ' "

The court then said (p. 242) that "the real basis of plaintiffs' claim is diversion of traffic from their business," and under the rule stated in *Rose* v. *State of California,* 19 Cal.2d 713, 737 [123 P.2d 505], and other cases, such damages are not compensable, as a landowner has no property right in the continuation or maintenance of the flow of traffic past his property.

On page 243 the court continues: "Damages resulting from the exercise of police power are not compensable. [Citing a case.] It seems quite clear that the division of a highway is an exercise of the police power being directly intended for the public safety."

The opinion then quotes, with approval, the following passage from Mr. Justice Edmonds' concurring opinion in the Bacich case (p. 243): " 'But the travelling of additional distances occasioned by modern traffic engineering to make travel more safe and to adapt the highway system to the adequate disposal of the increasingly heavy burden of automobile traffic—as, for example, by the construction of divided highway for various types of traffic, or the re-routing of traffic by one-way regulations or the prohibition of left-hand turns—is an element of damage for which the property owner may not complain in the absence of arbitrary action. . . . And, therefore, in testing the merits of the majority rule, mere "circuity of travel," in the sense that it refers to the additional distance required to be traversed because of a proper highway construction, should not be used to justify the allowance of compensation to the owner abutting upon the street in the block where the obstruction exists.' "

The court, in the Holman case, concluded that plaintiffs' property was open to the highway, and that "once on the highway to which they have free access, [plaintiffs] are in the same position and subject to the same police power regulations as every other member of the travelling public. . . . They are liable to some circuity of travel in going from their property in a northerly direction. They are not inconvenienced whatever when travelling in a southerly direction from their property. The re-routing or diversion of traffic is a police power regulation and the incidental result of a lawful act and not the taking or damaging of a property right.

". . . The damage of which plaintiffs complain would be the same if no division strip had been constructed on the highway in question but that double white lines had been painted on the highway and a 'no left turn' sign had been erected, or if the entire highway had been designated as a one-way street." (P. 244.)

This case involves precisely the problem involved in the instant case. The Ricciardi and Bacich cases are applicable only by way of analogy. It is obvious that no general rule can be laid down to cover all situations. We know that property placed in a cul-de-sac by reason of an improvement is entitled to compensation for the depreciation of the property. (Bacich case.) We know that if property is divided from the highway by an underpass and the only access to the highway is a service road, the property located on the service road has been legally damaged. (Ricciardi case.) We also know that mere relocation of a highway thus diverting traffic from the property does not legally damage the property. (*Holloway* v. *Purcell, supra.*) We also know that the construction of a divided highway in front of the property does not legally damage it. (Holman case.) The distinctions between these various situations and their impact on the actual value of the property is simply one of degree. Our case falls within the rule of the Holman case. For that reason the trial court correctly held that the owners of lots one, two, three, four and five were not legally damaged by the construction of the divided highway.

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied March 26, 1951. Carter, J., and Schauer, J., voted for a hearing.