Farmers-Kissinger Market House Company, Inc.,
Appellant, *v.* Reading et al.

Argued January 23, 1933. Before FRAZER, C. J., KEP-HART, SCHAFFER, MAXEY, DREW and LINN, JJ.

*J. B. Stevens,* of *Stevens & Lee,* with him *C. H. Ruhl* and *Charles H. Weidner,* for appellant.—The ordinances are unreasonable and unconstitutional: Donovan v. Penna. Co., 199 U. S. 279; Mellong Street, 182 Pa. 297.

*Geo. B. Balmer,* Assistant City Solicitor, with him *John W. Speicher,* City Solicitor, *Earle I. Koch* and *Oliver Lentz,* Assistant City Solicitors, for appellees.—Cities of the third class may, by ordinance, prohibit the construction, maintenance, and use of private driveways on certain streets.

The Act of June 27, 1913, P. L. 568, article V, section 3, clause 29, is constitutional and a proper exercise of the police power of the Commonwealth, and a proper delegation of such power to third-class cities: White's App., 287 Pa. 259; Phila. Elec. Co. v. Phila., 301 Pa. 291.

OPINION BY MR. JUSTICE MAXEY, March 27, 1933:

This is an appeal from the dismissal of plaintiff's bill in equity. It presents two questions: (1) whether the ordinance of a third-class city prohibiting the vehicular use of private driveways across the sidewalks of nine blocks along the busiest street of that city was enacted under legislative authority; and (2) (assuming the

first question to be answered in the affirmative) does that ordinance deprive a citizen of his property without compensation, that is, without that due process of law guaranteed by the Fourteenth Amendment of the United States Constitution?

Plaintiff is a corporation owning and operating market houses, one of which has a frontage of 120 feet on the south side of Penn Street (this street running east and west) between 8th and 9th Streets in the City of Reading, and extends at right angles 270 feet to Cherry Street, which means that the property extends through the middle of the block from Penn Street to Cherry Street. The second market house building is on Cherry Street on the other side of the street from the first building just described. It has a frontage of 40 feet on the south side of Cherry Street and is situated westward from the corner of 9th Street. The third market house building is also on the south side of Cherry Street and extends to 8th Street. Properties No. 2 and No. 3 are divided by a street called Peach Street.

These buildings and their equipment represent an investment in excess of one million dollars and consist for the most part of market stalls rented to more than 400 tenants for the purpose of vending merchandise. Public markets are held on Tuesday, Thursday and Saturday of each week.

The rear portion of the so-called Penn Street property consists of a large garage which was erected at a cost of $270,000. This fronts on Cherry Street and accommodates 300 cars.

Penn Street is the principal business street of Reading. It is eighty feet wide between building lines and contains two street railway tracks at its center. Between 8th and 9th Streets on Penn Street there is heavy vehicular traffic in both directions. On the sidewalk on the south side of Penn Street in front of plaintiff's property, it was found by actual count that sometimes more than 5,000 persons pass along this sidewalk each hour.

The garage (in the rear of the market house) which fronts on Cherry Street is accessible from the latter street, but plaintiff desired to make the garage accessible also from Penn Street. Accordingly, he had plans prepared for the necessary alterations to his building and for the construction of a driveway across the southern sidewalk of Penn Street. This driveway would pass through the market house. These plans were approved by the building inspector of the City of Reading. Three separate permits were granted plaintiff on June 16, 1930. The first was a permit good for three months "to make front drive from Penn Street as per plans." The second was a permit good for thirty days and "for the purpose of a driveway to garage." The third was a permit good for thirty days to plaintiff and to his contractor "to occupy street at 822 Penn Street for the purpose of building material."

Plaintiff thereupon proceeded to reconstruct his building and to strengthen the support of the sidewalk by inserting thereunder additional iron or steel "I" beams and joists, and expended on such reconstruction and strengthening of his sidewalk $8,000. He completed about 80% of the work planned, when he was stopped by municipal action which gave rise to the present proceedings.

Plaintiff received a letter dated July 17, 1930, from the Superintendent of the Department of Streets and Public Improvements revoking the permit for the construction of the driveway over the sidewalk "in accordance with the provisions of permit which state that all work shall be completed within thirty days after date of issue."

This revocation will cause plaintiff the loss of the $8,000 which he has expended pursuant to the permit and will also involve further expenditures to restore the property to its former condition.

On July 30, 1930, the council of the City of Reading enacted an ordinance which reads, inter alia, as follows:

"That, in the interest of public safety, the vehicular use of private driveways across the sidewalks on Penn Street from Second to Eleventh Streets, with the exception of the driveways in front of fire houses, be and the same is hereby prohibited." Section 2 provides penalties for the violation of the same. On January 28, 1931, another city ordinance was duly enacted prohibiting the construction and maintenance of private driveways across the sidewalks of Penn Street from Second to Eleventh Streets (except in front of fire houses) and prescribing penalties.

July 22, 1930, plaintiff filed a bill asking an injunction against the defendants restraining them "from revoking the permit issued to the plaintiff [i. e., the permit authorizing plaintiff to construct a driveway across the pavement in order to have access to the entrance to the garage] and further from interfering and prohibiting it [plaintiff] from constructing said crossing in accordance with the plans submitted and approved by defendants."

Defendants answered, averring that the use of the driveway would increase the traffic hazard, that no work had been done upon the pavement before the permit expired and that the prohibition was in the interest of public safety. They asked for the dismissal of the bill.

January 9, 1931, the chancellor filed an opinion holding the permit valid and its revocation without sanction of law and that defendants' interference with the completion of the driveway in accordance with the plans was without warrant in law.

Defendants then filed an amended answer, setting up the two ordinances already referred to.

September 8, 1931, the court declared both ordinances unreasonable, oppressive, confiscatory and without authority of law. Exceptions were filed by defendants and on January 8, 1932, the court having had its attention directed to the power conferred upon cities of the third class by the Act of June 27, 1913, P. L. 568, article V,

section 3, clause 29, handed down another opinion, dismissing plaintiff's bill and entering a final decree to that effect. Plaintiff thereupon appealed.

The Act of 1913, just referred to, provides (pages 586-7) that every city of the third class in its corporate capacity is authorized and empowered to enact ordinances for the following purposes: "......to prevent and punish the riding or driving of horses, mules, oxen, cattle, or other teams, or the passage of *any vehicle drawn. thereby, or self-propelled, over and across sidewalks,* and to regulate the passing of the same through the public streets."

The Act of May 27, 1919, P. L. 310, amending the Act of June 27, 1913, P. L. 568, is also cited. Section 12 of the Act of May 27, 1919, supra, amends article V, section 3, clause 16 of the Act of June 27, 1913, supra, so that it reads as follows: Every city of the third class in its corporate capacity is authorized and empowered to enact ordinances for the following purposes,...... "To require the removal of all obstructions and nuisances from the sidewalks, curbstones, gutters, streets, public alleys, ways, and street crossings, at the expense of the owners or occupiers of the ground fronting thereon......"

It is an established proposition that "the intention and meaning of the legislature must primarily be determined from the language of the statute itself, and not from conjectures aliunde. When the language of a statute is plain and unambiguous and conveys a clear and definite meaning, there is no occasion for resorting to the rules of statutory interpretation and construction; the statute must be given its plain and obvious meaning. This principle is to be adhered to notwithstanding the fact that the court may be convinced by extraneous circumstances that the legislature intended to enact something very different from that which it did enact": 25 R. C. L. 961, section 217.

Appellant contends "that the legislature in using the word 'sidewalks,' meant that part of the public highway upon which pedestrians have the exclusive right to be and not that part comprising a public or private driveway which leads from the main traveled portion of the highway into or along the property of an abutting owner. Such a driveway is not, strictly speaking, the sidewalk, although pedestrians have the right to cross it. ......
The intention of the legislature was to give the power to prevent nuisances such as driving a vehicle upon a sidewalk where pedestrians would not expect much traffic."

Whatever speculation may be indulged in about the legislative intent, the fact is that the legislature in plain and unambiguous language gave third-class cities by the Act of 1913 authority "to prevent......the passage of *any vehicles* drawn or *self-propelled over and across* sidewalks" and by the Act of 1919 authority "to require the removal of all obstructions and nuisances from the sidewalks."

In enacting the ordinances complained of, the City of Reading was clearly functioning within its statutory authority for the ordinances were reasonably adapted to effect the objects legislatively enumerated.

The next question is: Does the exercise by the defendants of the power conferred upon third-class cities by the State to prevent the construction of passageways for self-propelled vehicles "over and across sidewalks" in a congested section of the business district of Reading deprive the plaintiff of a valuable property right in contravention of the Fourteenth Amendment of the Constitution of the United States, which declares that "nor shall any state deprive any person of life, liberty or property without due process of law?" There is no doubt that the act of defendants in preventing the construction of the driveway planned by plaintiff across the sidewalk deprives him of a valuable interest or privilege, but this deprivation does not necessarily mean the taking of plaintiff's property without due process of law. Community life

requires some curtailment of the individual's freedom in the use of his property. For example, to require the owner of a motor car to reduce its speed to a certain limit or to stop at a red signal is to deprive him pro tanto of the full use of his property, but such deprivation is essential to the community's well being. The power of the State to compel a man to use his property in such a way as not to prejudice the general welfare is known as "the police power." In exercising this power the State must not act unreasonably; its laws shall not be arbitrary or violative of the fundamental principles of liberty and justice. See Hurtado v. Calif., 110 U. S. 516; Holden v. Hardy, 169 U. S. 366.

Blackstone in his fourth volume, section 162, says: "By the public police and economy I mean the due regulation and domestic order of the kingdom, whereby the individuals of the state, like members of a well-governed family, are bound to conform their general behavior to the rules of propriety, good neighborhood, and good manners, and to be decent, industrious, and inoffensive in their respective stations."

Cooley in his "Constitutional Limitations," 8th edition, volume 2, page 1223, says: "The police of a state, in a comprehensive sense, embraces its whole system of internal regulation, by which the state seeks not only to preserve the public order and to prevent offenses against the state, but also to establish for the intercourse of citizens with citizens those rules of good manners and good neighborhood which are calculated to prevent a conflict of rights, and to insure to each the uninterrupted enjoyment of his own so far as is reasonably consistent with a like enjoyment of rights by others."

Chief Justice SHAW in Com. v. Alger, 7 Cush. 53, 84, says: "We think it is a settled principle, growing out of the nature of well-ordered civil society, that every holder of property, however absolute and unqualified may be his title, holds it under the implied liability that his use of it shall not be injurious to the equal enjoyment of

others having an equal right to the enjoyment of their property, nor injurious to the rights of the community. All property in this Commonwealth is......held subject to those general regulations which are necessary to the common good and general welfare. Rights of property, like all other social and conventional rights, are subject to such reasonable limitations in their enjoyment as shall prevent them from being injurious, and to such reasonable restraints and regulations established by law as the legislature, under the governing and controlling power vested in them by the Constitution, may think necessary and expedient. This is very different from the right of eminent domain,—the right of a government to take and appropriate private property whenever the public exigency requires it, which can be done only on condition of providing a reasonable compensation therefor. The power we allude to is rather the police power." See also Jackman v. Rosenbaum Co., 263 Pa. 158, 166, 106 A. 238, affirmed in 260 U. S. 22.

That plaintiff has the right of egress from its property to Penn Street and the right of ingress from Penn Street to its property is not disputed. That the public has the right to the reasonably unhindered use of Penn Street and the sidewalks in front of plaintiff's property is equally indubitable. But plaintiff proposes to exercise its right of ingress and egress to and from Penn Street in such a manner and to such an extent that hundreds of the automobiles of its patrons will pass daily from its market and garage directly to Penn Street and from Penn Street directly to its market and garage. This will involve substantial interference with the extensive westbound and eastbound motor and street car traffic on Penn Street in the block in front of plaintiff's property, and substantial interference with the constant use of the sidewalks in front of plaintiff's property, by thousands of pedestrians.

Plaintiff already has vehicular ingress to and egress from its garage and market, on Cherry Street. If the

City of Reading were attempting to deny plaintiff's property all vehicular ingress and egress, the reasonableness of its act might justly be questioned, but plaintiff is now asking for *additional* vehicular ingress and egress, and it demands it to and from one of the most traveled blocks and over one of the most frequently used sidewalks of a city of 115,000 people. Plaintiff is in effect attempting to create a new thoroughfare to and from a busy block on a busy street. That new thoroughfare would not result in the relief of traffic in that block, but in its congestion and entanglement. All this plaintiff asks for solely in its own interests.

It is obvious then that here we have a conflict of interests between the plaintiff and the public of Reading. An interest becomes a right only when organized society sanctions and enforces it. There are certain interests of the individual which under ordinary circumstances are protected as rights, but even these "rights" forfeit their claim to legal sanction when their exercise becomes a menace to the general welfare. In the case before us, shall organized society in the form of the State sanction and enforce plaintiff's interest at the expense of the public's, or shall it sanction and enforce the public's interest at the expense of plaintiff's? The chief function of government is so to restrain the pursuit of individual interests as to preserve to the public reasonable freedom in the pursuit of its interests. This restraint of the individual must be not arbitrary but reasonable.

Who locates the boundary line between the interests of the individual and the interests of the public? In the first instance the legislature does this, and in each particular case the judiciary finally determines whether the legislature has reasonably functioned within its constitutionally prescribed ambit or whether it has arbitrarily infringed upon individual rights.

In Harris v. State Board of Optometrical Examiners, 287 Pa. 531, 536, 135 A. 237, this court said: "The legis-

lature under the police power does not possess the power to enact rules which have no substantial relation to the end to be attained. ...... Legislatures do not have the power, under the guise of police regulation, to arbitrarily invade the personal right and liberty of the individual. Its determination of the extent of its power is not final or conclusive: White's App., 287 Pa. 259 [134 A. 409]. If it pass an act, ostensibly in the exercise of the police power, but which unnecessarily interferes with the personal liberty of the citizen, the courts may examine the act and determine whether it relates to the objects which the exercise of the police power is designed to, and does, secure."

In Missouri Pacific Ry. Co. v. Omaha, 235 U. S. 121, 127, the Supreme Court of the United States said: "......The means to be employed to promote the public safety are primarily in the judgment of the legislative branch of the government, to whose authority such matters are committed, and so long as the means have a substantial relation to the purpose to be accomplished, and there is no arbitrary interference with private rights, the courts cannot interfere with the exercise of the power by enjoining regulations made in the interest of public safety which the legislature has duly enacted...... It is only in those clear and unmistakable cases of abuse of legislative authority that the court is authorized......,. to enjoin the exercise of legislative power."

The duly constituted municipal authorities of Reading evidently regarded the ordinance of January 28, 1931, now challenged, as a reasonable regulation to safeguard the public interest. The Court of Common Pleas of Berks County recognized and officially declared its reasonableness and validity. We find nothing in the record that leads us to reverse the conclusion of that learned court. The purpose to be accomplished by the ordinance is commendable, the means adopted have a rational relation to the accomplishment of that purpose, and the

interference with the exercise of plaintiff's right of property is not arbitrary but clearly demanded by the public welfare.

The decree is affirmed at appellant's cost.