TEXACO (PUERTO RICO) INC., demandante y recurrida, *v.* SECRETARIO DE OBRAS PÚBLICAS, demandado y recurrente.

Número: 12645    Resuelto: 21 de junio de 1962

Francisco Espinosa, Secretario de Justicia Interino, Arturo Estrella, Secretario Auxiliar y Alfonso García Martínez, Procurador General Auxiliar, abogados del Secretario de Obras Públicas; Beverley, Castro y Rodríguez Lebrón, abogados de la recurrida.

EL JUEZ ASOCIADO SR. RIGAU emitió la opinión del Tribunal.

La demandante construyó, posee y opera un establecimiento para la venta de gasolina al detal(1) ubicado entre dos carreteras que salen de la ciudad de San Juan hacia la parte Este de la Isla y las cuales por un buen trecho, y en el lugar de autos, corren más o menos paralelamente. Dicha propiedad colinda por el Norte con la carretera Núm. 187 que conduce de San Juan a Carolina pasando por la zona hotelera de Isla Verde, y por el Sur con la carretera Núm. 26

---

(1) Conocidos en Estados Unidos como "gasoline filling stations" o sencillamente como "filling stations" y en Puerto Rico como "puestos de gasolina" y como "garages".

que conduce de San Juan al Aeropuerto Internacional. La distancia entre ambas carreteras en el lugar donde está la propiedad en cuestión es de aproximadamente sólo unos 30 metros.

El Secretario de Obras Públicas de Puerto Rico, custodio de los terrenos, obras y caminos públicos, 3 L.P.R.A. sec. 411 y 9 L.P.R.A. secs. 140 y 141, concedió a la demandante con fecha de 6 de abril de 1954 un permiso para instalar en el sitio antes mencionado tres bombas para la venta de gasolina. Dicho permiso contiene una condición que lee como sigue:

*"Este permiso podrá ser revocado o enmendado en cualquier momento* cuando las necesidades del Gobierno Estatal o Municipal así lo exijan, y el tanque y bomba deberán ser removidos en un plazo de 48 horas, a contar desde la hora en que se reciba la comunicación certificada ordenando dicha remoción." (Subrayado nuestro.)

Desde el 22 de diciembre de 1955 la demandante comenzó a disfrutar de dicho permiso y a operar la estación de gasolina sin que el mismo hubiese sido revocado o enmendado por razones de necesidad del Gobierno de Puerto Rico o del Gobierno Municipal hasta el 20 de marzo de 1956, fecha en que el Secretario de Obras Públicas se dirigió a la demandante enmendando el permiso en la forma que veremos más adelante. La estación de gasolina según aprobada por el Secretario de Obras Públicas contaba con dos rampas de entrada y salida de vehículos en la carretera Núm. 187 y una rampa para entrar solamente en la carretera Núm. 26. ■

La Junta de Planificación de Puerto Rico tiene amplios poderes sobre zonificación, 23 L.P.R.A. secs. 9 y 10, y sobre la planificación de las carreteras y calles de Puerto Rico, 23 L.P.R.A. sec 11; *Seashore Realty, Etc.* v. *Junta*, 75 D.P.R. 142, 151 (1953). La ley ordena a la Junta a preparar un Plano Regulador, el cual podrá ser adoptado por la Junta en su totalidad o por partes, 23 L.P.R.A. sec. 8. Una de

estas partes adoptada por la Junta se denomina "Plano Regulador de Vías Públicas Principales para el área Metropolitana de San Juan". Dicha área Metropolitana incluye una región cuyo centro está localizado en Santurce, y que se extiende hasta Bayamón y Palo Seco por el Oeste, hasta Guaynabo y Saint Just en Trujillo Alto por el Sur y hasta Carolina por el Este. Incluye la municipalidad de Cataño y parte de las municipalidades de San Juan, Bayamón, Guaynabo, Trujillo Alto, Carolina y Toa Baja.[2]    La estación de gasolina aquí envuelta está localizada dentro de dicha área Metropolitana.

Desde que se creó por ley la Junta de Planificación de Puerto Rico[3] y "debido a la forma caótica en que se desarrollaba la zona conocida ahora como Area Metropolitana de San Juan, la Junta de Planificación decidió estudiar este problema, comenzando por sentar las bases para una planificación urbana adecuada en esta área, a través de la adopción de una red de vías públicas principales que abarcará toda esta zona."[4]

Previo los estudios pertinentes y vistas públicas la Junta adoptó en el 1944 su primer Plano Regulador de Vías Públicas Principales para el área Metropolitana de San Juan. Dicho plano estuvo en vigor por más de tres años y fue revisado previa vistas públicas en el año 1947.[5]    Fue bajo ese texto del año 1947 del Plano Regulador de Vías Públicas para el área Metropolitana que la demandante obtuvo su permiso de construcción de la Junta de Planificación en 16

---

[2] Plano Regulador Para el Desarrollo de Puerto Rico, Sección P. R. 2 B (Segunda Revisión), Vías Públicas Para el área Metropolitana de San Juan, 1954, Imprenta del Gobierno de P. R., págs. 8 y 21.

[3] Ley Núm. 213 de 12 de mayo de 1942, 23 L.P.R.A. sec. 4.

[4] Plano Regulador (Segunda Revisión), Vías Públicas Para el área Metropolitana de San Juan, 1954, citado en el escolio 2.

[5] La Ley de Planificación de Puerto Rico y los procedimientos en ella estatuidos son muy parecidos a la ley de planificación de la Ciudad de Nueva York y a sus procedimientos.—Rafael Picó, Prefacio al Boletín de Divulgación Núm. 9 de la Junta de Planificación de P. R., 1954, Imprenta del Gobierno de P. R., p. 4.

de julio de 1952 y el permiso del Secretario de Obras Públicas para instalar los tanques y bombas de gasolina en 6 de abril de 1954, cuando todavía la carretera Núm. 26 no había sido designada carretera expreso de accesos limitados (*controlled access highway*).

Siete años después de la primera revisión hecha en 1947 del mencionado Plano Regulador de Vías Públicas Principales para el área Metropolitana, la Junta de Planificación encontró necesario hacerle una segunda revisión al mismo debido al crecimiento de la ciudad y al consiguiente aumento en la densidad del tránsito de vehículos y en 8 de julio de 1954 se aprobó y se promulgó una segunda revisión de dicho Plano Regulador hecha, previa vista pública, por la Junta de Planificación.(⁶)

En este nuevo Plano Regulador Revisado la carretera Núm. 26 que colinda con la estación de gasolina de la demandante por el lado Sur de dicha estación fue designada Carretera Expreso Tipo A con accesos limitados y fue preparada al efecto. ■

A tenor con la nueva realidad de zonificación el Secretario de Obras Públicas en 20 de marzo de 1956 se dirigió por escrito a la demandante enmendando el permiso revocable que le había concedido, disponiendo la eliminación del acceso directo que tenía la estación de gasolina en la carretera Núm. 26, ahora carretera expreso. Mediante otra carta posterior el demandado informó a la demandante que bajo las disposiciones del Plano Regulador de Vías Públicas Principales aprobado el 9 de junio de 1954, la carretera PR-26 (Expreso Norte) era una carretera expreso y que de acuerdo con dicho Plano Regulador debía estar protegida contra el acceso directo de las propiedades limítrofes. Y también le decía:

---

(⁶) Proclama del Gobernador de 8 de julio de 1954, Boletín Administrativo Núm. 116, La Fortaleza, San Juan; Plano Regulador (Segunda Revisión) Etc. citado en el escolio 2, pág. 7.

"El acceso que tiene la estación de servicio de la Texas Company en Isla Verde, sobre la Expreso Norte, se opone a las disposiciones del plano regulador antes mencionado, el cual fue aprobado tras vistas públicas y de acuerdo a la Ley de Planificación. Igualmente se opone a las disposiciones Federales de ayuda económica para la construcción de vías públicas, según aceptadas por el Estado Libre Asociado de Puerto Rico.

"En vista de lo anterior, el Departamento de Obras Públicas para darle cumplimiento a la ley y proteger la seguridad pública, habrá de extender frente a la estación de servicio de la Texaco, en Isla Verde, la verja que aisla la Carretera Expreso Norte, cerrando así el acceso directo que usa dicha estación de servicio. Las obras habrán de comenzar el 3 de marzo de 1958, lo cual pongo en su conocimiento para los fines pertinentes." (Carta del Secretario de Obras Públicas a la demandante de 3 de enero de 1958, Exhibit 12, Estipulación de Hechos, párrafo Núm. 14.)

Quedaron intocadas las dos rampas de entrada y salida en la carretera Núm. 187. Además, no se suprimió del todo la comunicación entre la estación de gasolina y la carretera expreso ya que, según surge de la Estipulación de Hechos, a 142 metros al Este de la estación hay una intersección que hace posible ir de dicha carretera expreso a la estación de gasolina vía la carretera Núm. 187; y a 515 metros al Oeste de la estación hay otra intersección que hace posible lo mismo. Naturalmente, estas rutas son más indirectas y menos cómodas que la que proporcionaba el acceso directo eliminado. A este punto regresaremos más adelante.

La demandante recurrió al Tribunal Superior solicitando que éste determinase que la peticionaria tenía un "derecho adquirido en el acceso de entrada desde la Avenida Norte (Carretera Expreso Núm. 26) hasta la estación de servicio de gasolina de su propiedad" cuyo derecho, alegó, no podría ser anulado sin el pago de compensación. Falló a su favor el Tribunal Superior y ante nos recurre el demandado.

No tiene razón la demandante por dos razones principales e independientes entre sí. Una consiste en la propia natura-

leza del permiso que le fue expedido por el Secretario de Obras Públicas y la otra se funda en el derecho aplicable a esta situación.

## I

De la propia faz del permiso surge claramente que éste podía ser revocado o enmendado cuando fuese necesario por razones de orden público. Véase el párrafo del permiso citado anteriormente. Como veremos más adelante no hay duda de que el permiso fue enmendado por razones de orden público. Ante la propia letra explícita del permiso revocable y enmendable, la demandante alega que al enmendarlo se le priva *su* propiedad y que tiene un derecho adquirido. ¿Acaso las palabras no tienen sentido? ¿No es para dejar las cosas claras que los acuerdos, contratos, concesiones y permisos se ponen por escrito? El permiso reserva al Secretario el derecho hasta de ordenar la remoción de los tanques y las bombas de gasolina cuando sea necesario. Una estación de gasolina puede operar con dos entradas en vez de tres y con acceso a una carretera en vez de a dos pero difícilmente puede operar sin tanques y bombas de gasolina. La demandante tenía y tiene un permiso que, como el mismo documento expresa, podrá ser revocado o enmendado. Nótese que el documento no da margen a revocaciones o enmiendas arbitrarias, sino cuando las necesidades públicas lo hagan necesario. Eso es lo que significa la frase "cuando las necesidades del Gobierno Estatal o Municipal así lo exijan" que aparece en el antes citado párrafo del permiso.

## II

Pero independientemente de la citada cláusula del permiso ¿existe tal derecho adquirido de acceso de la estación de gasolina a la carretera expreso?

Sobre el problema la jurisprudencia en los Estados Unidos es abundante y conflictiva, pero mucho menos conflictiva aho-

ra que hace cuatro o cinco décadas. (⁷)    También el asunto se
ha tratado en las revistas jurídicas.    Preside esta área juris-
prudencial un caso muy citado que fue resuelto por el Tribunal
Supremo de los Estados Unidos en el año 1907, *Sauer* v. *New
York*, 206 US 536, 51 L. Ed. 1176.    Nueva York construyó
para uso público un viaducto frente a la propiedad privada de
Sauer lo cual perjudicó en forma importante el acceso de dicha
propiedad a la calle y también limitó la libre entrada de luz
y aire a la misma propiedad.    El más alto tribunal de Nueva
York denegó compensación y la demandante recurrió al Tri-
bunal Supremo federal alegando que se le había negado el
debido procedimiento de ley al tomársele su propiedad sin ha-
berla compensado.    Al sostener al tribunal de Nueva York
el Tribunal Supremo federal expresó que el problema se re-
ducía a determinar si existía tal derecho compensable de ac-
ceso a la calle como alegaba la demandante y luego de citar
casos que sostienen la posición asumida por Nueva York,
añadió "Seguramente la solución de ese problema corresponde
al tribunal estatal.    Dicho tribunal puede determinar que el
propietario colindante con la calle no tiene derecho alguno de
acceso a la misma; puede determinar que tiene un derecho
limitado; o que tiene un derecho absoluto."    Expresó además
que cada Estado hará sus propias determinaciones sobre el
particular de acuerdo con su propia ley y sus criterios sobre
política pública. (⁸)

Tradicionalmente en el derecho común inglés (⁹) y nortea-
mericano (¹⁰) se reconoció jurisprudencialmente que los co-
lindantes con calles y caminos tienen un derecho de acceso a la
vía pública.    Este derecho se consideró como una servidum-
bre (*easement*) a favor del predio colindante y se sostuvo que

---

(⁷) Bowie, *Limiting Highway Access*, 4 Md. L. Rev. 219, 245-246 (1940) ;
Reseña en 30 Miss. L.J. 197 (1959).

(⁸) 51 L. Ed. 1182.

(⁹) *Berridge* v. *Ward*, 2F. & F. 208, 175 Eng. Rep. 1026 (N.P.1860) ;
*Ramuz* v. *The Southend Local Board*, 67 L.T. 169 (1892).

(¹⁰) *Bacich* v. *Board of Control*, 23 Cal.2d 343, 144 P.2d 818 (1943) ;
*People* v. *Ricciardi*, 23 Cal.2d 390, 144 P.2d 799 (1943).

su destrucción debía ser compensada. El Juez Holmes, disintiendo en *Mulhker* v. *New York & Harlem R.R. Co.*, 197 US 544, 573 (1905), expresó que si originalmente los tribunales hubiesen declarado que tal servidumbre no existía y que los colindantes sólo tenían respecto a las calles y caminos los mismos derechos que los que tiene el público en general, tal declaración no hubiese sido sorprendente.(11) Naturalmente, los tribunales que establecieron esa teoría de la servidumbre tenían ante sí casos en que se trataba de calles y carreteras corrientes u ordinarias (12) y se basaron generalmente en dos criterios. Uno de éstos era el propósito de esos caminos, el cual fue proveer vías de comunicación a los hogares, fincas y negocios allí ubicados, y el otro criterio consistía en que se consideraba que existía una obligación de parte del Estado de mantener esos caminos al servicio de esos colindantes por razón de que dichos propietarios habían contribuido a la construcción de los mismos en forma directa, unas veces con mano de obra, otras mediante derramas especiales impuéstales para ese fin (*special assessments*) y otras veces cediendo el terreno para su construcción.(13) Ya esas circunstancias no ocurren comúnmente. En Puerto Rico las carreteras se construyen unas con fondos estatales y otras con fondos estatales y federales combinados. En el caso de las carreteras expreso tampoco se aplica ese razonamiento porque además de su modo de financiamiento mencionado, las mismas se construyen precisamente para proporcionar vías rápidas al tránsito y para evitar el peligro y las inconveniencias que presentan las frecuentes intersecciones y las muchas entradas y salidas a negocios y residencias. Abrir

---

(11) Otros tres jueces concurrieron con el disenso del Juez Holmes. 49 L. Ed. 880.

(12) Denominadas en la jurisprudencia "land service roads".

(13) V. Covey, *Frantage Roads: To Compensate or not to Compensate*, 56 Nw. U.L. Rev. 587, 597 (1961); Gibbes, *Control of Highway Access*, 12 S.C.L.Q. 377, 381 (1960); *Freeways and the Rights of Abutting Owners* en 3 Stan. L. Rev. 298, 300 (1951); Cunnyngham, *The Limited-Access Highway from a Lawyer's Viewpoint*, 13 Mo. L. Rev. 19, 31 (1948); Clarke, *The Limited-Access Highway*, 27 Wash. L. Rev. 111, 116 (1952).

las carreteras expreso a muchas entradas derrotaría el propósito que se persigue al construirlas a gran costo. Las carreteras expreso son la antítesis de las carreteras ordinarias (*land service roads*). *Pennysaver's Oil Co.* v. *State*, 334 S.W.2d 546, 548 (1960); 13 Mo. L. Rev. 19-25. ▆

Ese derecho de servidumbre, que como hemos dicho se creó originalmente por los tribunales ingleses y norteamericanos, de valor económico para su propietario, evolucionó y como era de esperarse ahora se reconoce prácticamente sin excepción por esos mismos tribunales que es un derecho sujeto al poder público del Estado (*police power*) y que está sujeto al más importante valor social que constituye la seguridad, salud y el bienestar del público en general. En consecuencia el poder público del Estado—cuyo ejercicio, a diferencia del poder de expropiación, no conlleva compensación— ha sido sostenido en esta materia en casos en que se ha establecido tránsito unidireccional,[14] carreteras divididas,[15] prohibiciones de virar en U y de virar a la izquierda,[16] reglamentación sobre tamaño y peso de vehículos,[17] el establecimiento de estacionómetros[18] y desvío del tránsito,[19] todo ello con inevitables consecuencias per-

---

[14] *Chissell* v. *Baltimore*, 193 Md. 535, 69 A.2d 53 (1949); *Cavanaugh* v. *Gerk*, 313 Mo. 375, 280 S.W. 51 (1926).

[15] *Iowa State Highway Commission* v. *Smith*, 248 Iowa 869, 82 N.W.2d 755 (1957); *People* v. *Thompson*, 260 P.2d 658 (Cal. Dist. Ct. 1953); *People* v. *Savig*, 101 Cal. App. 2d 890, 226 P.2d 702 (1951); *Fort Smith* v. *Van Zandt*. 197 Ark. 91. 122 S.W.2d 187 (1938).

[16] *Iowa State Highway Commission* v. *Smith*, supra, escolio 15; *Jones Beach Blvd. Estate* v. *Moses*, 268 N. Y. 362, 197 N.E. 313, 100 A.L.R. 487 (1935)

[17] *Wilbur* v. *City of Newton*, 301 Mass. 97, 16 N.E.2d 86, 121 A.L.R. 570 (1938).

[18] *Morris* v. *City of Salem*, 179 Ore. 666. 174 P.2d 192 (1946).

[19] *Wolff* v. *City of Los Angeles*, 49 Cal. App. 400, 193 Pac. 862, 863 (1920); *City of Stockton* v. *Marengo*, 137 Cal. App. 760, 764, 31 P.2d 467 (1934); *Nelson* v. *State Highway Board*, 110 Vt. 44, 1 A.2d 689, 118 A.L.R. 915 (1938); *Elks* v. *Board of Commissioners*, 179 N. C. 241, 102 S. E. 414 (1920); *Board of Supervisors of Chenango County*, 257 App. Div. 1058. 13 N.Y.S.2d 730 (1939); *People* v. *Gianni*, 130 Cal. App. 584, 20 P.2d 87 (1933); *Quin* v. *Mississippi State Highway Commission*, 194 Miss.

judiciales para los dueños de determinadas propiedades y de negocios allí ubicados. Como se dijo en *Jones Beach Boulevard Estate* v. *Moses*, 268 N. Y. 362, 197 N. E. 331, 35, 100 A.L.R. 487, 490 (1935) : "Los derechos de los propietarios colindantes con las calles y carreteras están sujetos al derecho del estado a reglamentar el uso de las mismas para beneficio del público." Idéntica afirmación se hace en *Muse* v. *Mississippi State Highway Commission*, 103 So.2d 839, 846 (1958). En un caso reciente que también trata de la pérdida de acceso a una carretera, el Tribunal Supremo de California recordó que hace ya mucho tiempo se reconoce que no hay derecho a ser compensado por todos los daños que pueda ocasionar la construcción de una obra pública y añadió que la Constitución no garantiza compensación por cada perjuicio económico causado por una mejora pública. *People* v. *Symons*, 357 P.2d 451, 453 (1960).

Hay casos muy parecidos al de autos. En el de *Wood* v. *City of Richmond*, 138 S. E. 560 (1927) ([20]) el demandante construyó una estación de gasolina que daba a dos calles; las autoridades le expidieron un permiso revocable para construir una entrada a la estación en cada una de las dos calles; luego de construídas las dos entradas las autoridades le exigieron que eliminase una de ellas porque violaba una ordenanza de zonificación. El demandante alegó que tenía un derecho de acceso a ambas calles. El tribunal sostuvo que su derecho de acceso estaba sujeto al derecho del municipio a reglamentar el uso de las calles en beneficio de la seguridad, salud y bienestar del público.

En *Pennysavers Oil Co.* v. *State*, supra, resuelto en 1960 se trata, como en el caso de autos, de la pérdida del acceso

411, 11 So.2d 810 (1943); *In re Appointment of Viewers*, Johnson, 344 Pa. 5, 23 A.2d 880 (1942).

([20]) Citado con aprobación en: *Town of Leesburg* v. *Tavener*, 82 S.E.2d 597, 600 (1954); *Farris Bowling et al* v. *City of Somerset*, 333 S.W.2d 769 (1960); *Windsor* v. *Lane Development Co.*, 158 N.E.2d 391, 394 (1958); *City of Miami* v. *Girtman*, 104 So.2d 62 (1958); y *Alexander Co.* v. *City of Dwatonna*, 24 N.W.2d 244, 258 (1946).

directo a una carretera por parte de una estación de gasolina. La carretera Núm. 9 era antes de la mejora una carretera ordinaria o convencional y a ella tenía acceso la estación de gasolina. Luego dicha carretera fue designada carretera expreso de accesos limitados y la estación de gasolina perdió su acceso directo a la misma reteniendo solo acceso indirecto. Antes de la reclasificación de la carretera la estación de gasolina era un negocio próspero; luego del cambio resultó un negocio malo. El tribunal sostuvo que la conversión de la carretera ordinaria en una expreso caía dentro del poder público del Estado y que por lo tanto no había que compensar. "El colindante con la carretera", dijo el tribunal, "no tiene un derecho adquirido en el tránsito que pasa frente a su propiedad."

En *Farmers-Kissinger Market House Co.* v. *City of Reading*, 165 A. 398 (1933) la demandante poseía una serie de negocios en una área determinada, uno de los cuales era un garage que tenía acceso a una calle. El solar daba a dos calles y la demandante se dispuso comunicar el garage con la otra calle también. Los planos de la demandante fueron aprobados por las autoridades, quienes también le expidieron los permisos necesarios. Cuando la obra estaba a medio construir las autoridades le revocaron el permiso de la entrada a la segunda calle. Se sostuvo la denegatoria de la segunda entrada. Expresó el tribunal a la pág. 401 que la vida en sociedad hace necesaria ciertas limitaciones al uso de la propiedad por parte de sus dueños.

En *City of San Antonio* v. *Pigeonhole Parking*, 311 S.W.2d 218, 73 A.L.R.2d 640 (1958) se trataba de un edificio de diez pisos construído para el estacionamiento de vehículos cuyo solar daba a dos calles. Sólo se le permitió acceso a una de las calles y el tribunal sostuvo a las autoridades en el ejercicio del poder público del Estado (*police power*). Allí se dijo a la pág. 223 que el criterio para evaluar la razonabilidad de la acción de las autoridades no es

meramente si la otra entrada era esencial para la operación del negocio sino si dicha entrada expondría al público a peligros mayores que el perjuicio que su denegación causaba. Para otros casos sosteniendo el mismo principio en situaciones parecidas, véase, *Darnall* v. *State,* 108 N.W.2d 201, 205 (1961), "El dueño de un establecimiento comercial frente al cual pasa una carretera no tiene un derecho adquirido para insistir en que la carretera permanezca inmutable en un mundo cambiante." *Nick* v. *State,* 109 N.W.2d 71 (1961); *Department of Highways* v. *Jackson,* 302 S.W.2d 373 (1957); *Iowa* v. *Smith et al,* 82 N.W.2d 755, 73 A.L.R.2d 680; *Hillerege* v. *City of Scottsbluff,* 83 N.W.2d 76; *Smith* v. *Baltimore,* 761 A. 642 (1935); *Fowler* v. *City,* 246 S. W. 638 (1923). En 73 A.L.R.2d 691 se dice: "Prácticamente todos, si no absolutamente todos, los casos de la presente anotación reconocen explícita o implícitamente que el gobierno o sus organismos tienen el poder de reglamentar el tránsito en beneficio del público en general aunque al hacerlo intervengan con la conveniencia de los que colindan con los caminos o hagan necesario rutas indirectas." ■

Como mencionamos anteriormente, en nuestro caso los dos accesos a la carretera 187 quedaron intocados pero el acceso directo de la carretera 26 a la estación de gasolina se va a suprimir y en su lugar quedan los accesos indirectos antes mencionados a 142 metros uno y a 515 metros otro del garage. Se ha establecido que no es compensable la inconveniencia que sufre el predio colindante con la carretera, inconveniencia que comparte con el público en general, cuando por razones de seguridad y debido a reglamentación del tránsito es necesario establecer accesos más indirectos, largos o inconvenientes que el que originalmente disfrutaba la propiedad colindante. Estos accesos más largos e indirectos son resultados de las carreteras modernas y de las soluciones que la ingeniería civil ha proporcionado para resolver los problemas del mucho tránsito y para eliminar de las vías

públicas la fuente de accidentes que representan las frecuentes intersecciones y las entradas y salidas a propiedades adyacentes. La jurisprudencia norteamericana ha denominado *"circuity of travel"* esta situación y se reconoce que es un ejercicio legítimo del poder público del estado (*police power*) y que no constituye una toma de, o perjuicio a, la propiedad privada y por lo tanto no es compensable. *Wilson* v. *Iowa State Highway Commission*, 90 N.W.2d 161 (Iowa 1958); *Carazalla* v. *Wisconsin*, 71 N.W.2d 275 (1955); *Brady* v. *Smith* 79 S.E.2d 851 (W. Va. 1954); *Lindley* v. *Oklahoma Turnpike Authority*, 262 P.2d 159 (Okla. 1953); *Beckman* v. *State*, 64 Cal.App.2d 487, 149 P.2d 296 (1944); *Cavanaugh* v. *Gerk*, supra; *Fort Smith* v. *Van Zandt*, supra; *People* v. *Savig*, supra; Anotación, 100 A.L.R. 491 (1936). En *Jones Beach Boulevard*, supra, se sostuvo un acceso indirecto de cinco millas por hacerlo así necesario las circunstancias de aquel lugar. ▪

Aunque hay excepciones, [21] generalmente se sostiene que si el acceso a la carretera se obstruye *totalmente* entonces el dueño del fundo perjudicado debe ser compensado. [22]. En Puerto Rico ninguna finca quedaría permanentemente enclavada si su propietario da los pasos pertinentes ya que el Código Civil dispone que el dueño de una finca enclavada entre otras ajenas y sin salida a camino público, tiene derecho a exigir paso por las fincas vecinas, previa la correspondiente indemnización. 31 L.P.R.A. secs. 1731-1737.

El Plano Regulador de Vías Públicas de 1947 fue revisado en 1954 por la Junta en el ejercicio de sus facultades y deberes. [23] Es de conocimiento general el desarrollo que se ha

---

[21] *Socony-Vacuum Oil Co.* v. *Murdock*, 165 Misc. 713, 1 N.Y.S.2d 574 (Sup. Ct. 1937); *Barret* v. *Union Bridge Co.*, 117 Ore. 220, 243 Pac. 93 (1926).

[22] *People* v. *Al G. Smith Co.*, 86 Cal. App.2d 308, 194 P.2d 750 (4th Dist. 1948); *United States* v. *Welsh*, 217 U.S. 333 (1910); *Bohm* v. *Metropolitan Ry.*, 129 N. Y. 576, 29 N. E. 802 (1892); 29 C. J. S. *Eminent Domain*, sec. 167, p. 1038, n. 27 (1941); y V. además 73 A.L.R.2d 659.

[23] Plano Regulador, Etc., citado en el escolio 2.

operado en Puerto Rico durante los últimos años. Dicho crecimiento tiene índices positivos y negativos. En 1940 la población del área Metropolitana de San Juan era de 338,537 personas, en 1950 era de 508,570 y en 1960 subió a 647,979.[24] Durante los años 1947 y 1954 el número de vehículos de motor aumentó en un 120 por ciento.[25] En el 1954 casi la mitad del número total de vehículos que había en Puerto Rico era del área Metropolitana.[26] Igualmente ocurre al presente.[27] Durante esos mismos años los accidentes de tránsito aumentaron en más del 50 por ciento.[28] La Policía informa que la mitad del número total de accidentes ocurridos en la Isla tienen lugar en el área metropolitana.[29] El índice de muertes por millón de vehículos-millas recorridas es de 15.5 en Puerto Rico; en los Estados Unidos es de 5.3 (año de 1960).[30] Este alto índice de accidentes es motivo de preocupación para la comunidad; la prensa se ha ocupado de él editorialmente con frecuencia; el Primer Ejecutivo ha hecho referencia al mismo en sus Mensajes Anuales a la Asamblea Legislativa del país en el 1960 y 1961. La comunidad ha tomado medidas sobre el particular: una nueva Ley de Tránsito, 9 L.P.R.A. secs. 301 y ss., aumento en la fuerza policíaca, mejoras en las carreteras, construcción de modernos cruces a distinto nivel (*cloverleaves*), interseccio-

[24] Junta de Planificación, Informe Económico al Gobernador, 1961, pág. 85.

[25] Junta de Planificación, *Anuario Estadístico* de 1959, p. 205. Este dato difícilmente ha pasado desapercibido por la demandante pues tiene que haberse reflejado en sus ventas de gasolina en Puerto Rico.

[26] Junta de Planificación, *Anuario Estadístico*, 1959, p. 206. Para el cómputo se tomaron los municipios de San Juan, Bayamón, Carolina, Guaynabo, Cataño y Trujillo Alto.

[27] El último dato obtenido es de fines de 1961. Información oficial suministrada por el Departamento de Obras Públicas de P. R., oficina que tiene a su cargo el registro de vehículos de motor en Puerto Rico.

[28] Junta de Planificación, *Anuario Estadístico de* 1959, p. 34.

[29] Policía de Puerto Rico, *Datos Estadísticos*, 1961 p. 26.

[30] Francisco Lizardi, Secretario de Obras Públicas de P. R., Discurso ante la Asamblea de la Cruzada Cívica Pro Seguridad del Tránsito, 29 mayo 1962.

nes mayores, y construcción de carreteras expreso con accesos limitados. [31]

La carretera expreso PR–26, como se dijo antes, conduce de San Juan al Aeropuerto Internacional, el mayor aeropuerto de la Isla. En 1947 el número de pasajeros que entró y salió de Puerto Rico por ese aeropuerto fue 237,374, [32] en 1954 fue 605,005 y en 1961 fue 1,472,991. Diariamente más de 4,000 pasajeros entran y salen de ese aeropuerto. Los vuelos diarios pasan de 100. En el 1961 pasaron 23,978 toneladas de carga por dicho aeropuerto. [33] Casi la totalidad de esos pasajeros y esa carga entra y sale del aeropuerto por la carretera Núm. 26. Es claro que ante esa realidad de una comunidad en rápido desarrollo y luego de siete años, la Junta de Planificación estaba plenamente justificada en revisar el Plano Regulador de Vías Principales. ■

Además, los reglamentos y las determinaciones de zonificación no son contratos; los organismos públicos apropiados pueden enmendarlos cuando es necesario. *Reichelderfer* v. *Guinn*, 287 U. S. 315, 77 L. ed. 331 (1932) ; *Clifton Hills Realty Co.* v. *Cincinnati*, 21 N.E.2d 993 (1938).

La demandante arguye que el Oficial de Permisos, un funcionario de la Junta de Planificación, le expidió un permiso de uso en 21 diciembre 1955, esto es, luego de la revisión por la Junta del Plano Regulador. Esta situación es distinta de la que tuvimos ante nos en *Phi Delta Phi* v. *Junta*, 76 D.P.R. 585. Allí no se trataba de una obra tan ligada al interés público como es una carretera expreso en un área tan congestionada como el área metropolitana de San Juan; allí se trataba de una casa club privada. Además en el caso de autos, a diferencia de la situación planteada en *Phi Delta Phi*, el edificio no ha quedado inefectivo e inútil

---

[31] Sobre la necesidad de las carreteras de accesos limitados debido a las condiciones de la vida moderna véase Gottman, *Megapolis*, 1961, Cap. 12, p. 631; y Rigotti, *Urbanismo*, 1960, p. 117.

[32] *Anuario Estadístico*, 1959, pág. 218.

[33] Puerto Rico Ports Authority, *Annual Report*, 1961. págs. 2, 4 y 5.

pues como se ha dicho la estación de gasolina sigue disfrutando de varios accesos a las carreteras de Puerto Rico y la edificación sigue utilizándose en virtud de dicho permiso. Además véase *S. B. Garage Corporation et al.* v. *Murdock*, 55 N.Y.S.2d 456, 459 (1945); I Rathkopf, *The Law of Zoning and Planning*, 3rd. ed., pág. 897. ■

En cuanto al problema de compensar o no por limitaciones al acceso de los colindantes a las carreteras expreso nuevas o cuando se convierte una carretera convencional en una carretera expreso la gran preponderancia de las autoridades se decide por la norma de no compensar basándose en que se trata de un ejercicio justificado y necesario del poder público del Estado (*police power*). Sin duda esta clara tendencia de la jurisprudencia contemporánea en casi todas las jurisdicciones se debe a que los tribunales, como el público en general, comprenden que las condiciones de la vida moderna hacen necesario, y a veces imprescindible como señalan algunos, la construcción de carreteras expresos. Los grandes centros urbanos han crecido enormemente, el tránsito de vehículos de motor congestiona las arterias más importantes, se vive más lejos de los sitios de trabajo, de educación, de recreo, etc. También se señala por los que han estudiado el problema que las carreteras expresos, con su mínimo de intersecciones, con sus cruces a distinto nivel y su tráfico unidireccional reducen considerablemente el número de accidentes. La regla jurisprudencial que creó originalmente, como señalamos al principio, el derecho de acceso tuvo su origen en consideraciones de política pública; habiendo variado las circunstancias que dieron origen a aquella regla es comprensible que los tribunales hayan formulado una nueva regla también fundada en consideraciones de política pública consonantes con las circunstancias de nuestra época.(34)

---

(34) Además de los artículos citados en los escolios 7 y 13 véanse 33 *Wis. L. Rev.* 567 (1959); 109 *U. Pa. L. Rev.* 120 (1960); 18 *Wash. & Lee L. Rev.* 138 (1961); 11 *Baylor L. Rev.* 165 (1958); 35 *N.D.L. Rev.* 77 (1959);

Concluimos, a la luz de lo establecido por las autoridades mencionadas y de las consideraciones que anteceden, que el derecho, que es también una obligación, del Estado a reglamentar el tránsito de vehículos y a hacer obras públicas para el mejor flujo del mismo es un ejercicio legítimo del poder público del Estado (*police power*). Dicho poder público que es indispensable para que el Estado cumpla su deber de velar por la seguridad, salud y bienestar general es amplio y el hecho de que en determinada ocasión su ejercicio legítimo haga imposible la utilización más económica de una propiedad, no lo hace inconstitucional, *Goldblatt* v. *Hempstead*, 369 U.S. 590 (1962). El caso de autos cae dentro de la norma expresada. En este caso no hubo destrucción total de acceso de la demandante a las vías públicas. No existe un derecho absoluto de acceso a los caminos públicos de las propiedades colindantes; ese derecho está sujeto, como todo otro derecho, al ejercicio razonable del poder público del Estado. Al construir carreteras expreso nuevas o al convertir carreteras convencionales en carreteras expreso, el Estado puede modificar y limpiar el acceso a la carretera expreso de los predios adyacentes a la misma.

En última instancia, el conflicto de intereses en estos casos no es realmente un conflicto entre los intereses del propietario del predio y el Estado, sino que es un conflicto entre los intereses del propietario del predio y la comunidad

---

1 *Current Municipal Problems* 62 (1959); *Ibid* Vol. 3, p. 14 (1961); *Ibid* Vol. 3, p. 101 (1962); y 33 *Ore. L. Rev.* 16, 40 (1953) en donde se dice: "[I]t is submitted that the public interest in promoting a highway program of access limitation demands a judicious effort to prevent the dissipation of public funds in the acquisition of access rights which would result from any unwarranted extension of the abutting landowner's right of access."

 Sobre el enfoque que debe darse a estas situaciones creadas por grandes cambios sociales, véase Friedman, *Law in a Changing Society* (1959) — "American legal opinion has moved far from the days when the sacrosanctity of private property was the core of its thinking" (p. 80); y a Pound en 46 *Minn. L. Rev.* 117 (1961).

en general ya que ésta es la usuaria y beneficiaria de las vías públicas.

*Se revocará la sentencia dictada en 21 de noviembre de 1958 por el Tribunal Superior, Sala de San Juan, en este caso, y se desestimará la demanda.*