TEXACO (PUERTO RICO) INC., Plaintiff and Appellee, *v.* SECRETARY OF PUBLIC WORKS, Defendant and Appellant.

No. 12645.   Decided June 21, 1962.

Francisco Espinosa, Acting Secretary of Justice, Arturo Es-
trella, and Alfonso García Martínez, Assistant Secretaries of
Justice, for the Secretary of Public Works.  Beverley, Castro
& Rodríguez Lebrón for appellee.

MR. JUSTICE RIGAU delivered the opinion of the Court.

The plaintiff constructed, owns, and operates a retail
gasoline station[1] situated between two highways leading from

---

[1] Known in the United States as "gasoline filling stations" or simply
"filling stations," and in Puerto Rico as "gasoline stations" and "garages."

San Juan to the eastern part of the Island which run more or less parallel along a long stretch at the place under consideration. The said property is bounded on the north by highway No. 187 running from San Juan to Carolina through the hotel zone of Isla Verde, and on the south by highway No. 26 running from San Juan to the International Airport. The distance between both highways where the property in question is situated is approximately 30 meters.

On April 6, 1954 the Secretary of Public Works of Puerto Rico, custodian of the public lands, works, and roads, 3 L.P.R.A. § 411, and 9 L.P.R.A. §§ 140 and 141, issued a permit to the plaintiff to install in the above-mentioned place three pumps for the sale of gasoline. The said permit contains a condition which reads as follows:

*"This permit may be revoked or amended at any time* whenever the needs of the Commonwealth or Municipal Governments so require, and the tank and pump shall be removed within a period of 48 hours counted as of the receipt of the registered letter ordering such removal." (Italics ours.)

Since December 22, 1955 the plaintiff commenced to enjoy such permit and to operate the filling station without the same having been revoked or amended for reasons of necessity of the Government of Puerto Rico or of the Municipal Government until March 20, 1956, when the Secretary of Public Works wrote to the plaintiff amending the permit in the manner which we shall presently see. The filling station, as authorized by the Secretary of Public Works, had two ramps for the entrance and exit of vehicles on highway No. 187 and one ramp for entering only on highway No. 26.

■ The Planning Board of Puerto Rico has full powers over zoning, 23 L.P.R.A. § § 9 and 10, and over the planning of the highways and streets of Puerto Rico, 23 L.P.R.A. § 11; *Seashore Realty & Invest. Co.* v. *Planning Board,* 75 P.R.R. 134, 142 (1953). The Act orders the Board to prepare a Master Plan which may be adopted by the Board as a whole

or in parts, 23 L.P.R.A. § 8. One of these parts adopted by the Board is entitled "Master Plan for Major Thoroughfares for the Metropolitan Area of San Juan." Such Metropolitan Area includes a region the center of which is located in Santurce and extends as far as Bayamón and Palo Seco on the west, as far as Guaynabo and Saint Just in Trujillo Alto on the south, and as far as Carolina on the east. It includes the Municipality of Cataño and part of the Municipalities of San Juan, Bayamón, Guaynabo, Trujillo Alto, Carolina, and Toa Baja.[2] The filling station involved herein is located within the said Metropolitan Area.

Since the Planning Board of Puerto Rico[3] was created by law, and "in view of the chaotic manner in which the zone known as Metropolitan Area of San Juan was being developed, the Planning Board undertook to study this problem by laying first the bases for a proper urban zoning in this area, through the adoption of a network of principal public highways which will comprise this entire zone."[4]

After making pertinent studies and holding public hearings, the Board adopted in 1944 its first Master Plan for Major Thoroughfares for the Metropolitan Area of San Juan. That plan was in force for more than three years and was revised after public hearings were held in 1947.[5] It was under the 1947 text of the Master Plan for Major Thoroughfares for the Metropolitan Area that the plaintiff obtained its construction permit from the Planning Board on July 16, 1952 and the permit of the Secretary of Public Works to install

[2] Master Plan for the Development of Puerto Rico, P.R. Section 2B (2d revision), Thoroughfares for the Metropolitan Area of San Juan, 1954, Government of P. R. Printing Press, pp. 8 and 21.

[3] Act No. 213 of May 12, 1942, 23 L.P.R.A. § 4.

[4] Master Plan (2d revision), Thoroughfares for the Metropolitan Area of San Juan, 1954, cited in footnote 2, p. 5.

[5] The Planning Act of Puerto Rico and the procedures therein provided are very similar to the Planning Act of the City of New York and its procedures. Rafael Picó, Preface to Information Bulletin No. 9 of the Planning Board of P. R., 1954, Government of P. R. Printing Press, p. 4.

the gasoline tanks and pumps on April 6, 1954, at a time when highway No. 26 had not been designated as a controlled-access highway.

Seven years after the first revision made in 1947 of the said Master Plan for Major Thoroughfares for the Metropolitan Area, the Planning Board found it necessary to make a second revision owing to the growth of the city and the consequent increase in the density of the traffic of vehicles, and on July 8, 1954 a second revision of the Master Plan was approved and promulgated by the Planning Board after holding a public hearing.[6]

In this new revised Master Plan highway No. 26, which adjoins the plaintiff's filling station on the south, was designated as Controlled-Access Highway Type A and prepared accordingly.

■ In consonance with the new zoning reality, on March 20, 1956 the Secretary of Public Works wrote a letter to the plaintiff amending the revocable permit which he had issued, ordering the elimination of the direct access of the filling station to highway No. 26, now a thruway. In another subsequent letter the defendant informed the plaintiff that under the provisions of the Master Plan for Major Thoroughfares approved June 9, 1954, highway PR–26 (Expreso Norte) was a thruway, and that according to the Master Plan it should be protected against the direct access of the abutting properties. And he also said:

"The access to the Texas Company service station in Isla Verde on Expreso Norte conflicts with the provisions of the master plan mentioned above, which was approved after public hearings were held and in accordance with the Zoning Act. It also conflicts with the federal financial-aid provisions for the construction of public highways, as accepted by the Commonwealth of Puerto Rico.

---

[6] Proclamation of the Governor of July 8, 1954, Administrative Bulletin No. 116, La Fortaleza, San Juan; Master Plan (2d revision), etc., cited in footnote 2, p. 7.

"In view of the foregoing, and in order to comply with the Act and promote public safety, the Department of Public Works will extend in front of the Texaco service station in Isla Verde the fence which isolates the Expreso Norte Highway thereby closing the direct access used by the filling station. The works will commence on March 3, 1958, notice of which is hereby given to you for pertinent purposes." (Letter of the Secretary of Public Works to the plaintiff of January 3, 1958, Exhibit 12, Stipulation of Facts, paragraph No. 14.)

The two entrance and exit ramps on highway No. 187 remained untouched. Moreover, the communication between the gasoline station and the thruway was not completely eliminated since, as it appears from the Stipulation of Facts, at a distance of 142 meters east of the station there is an intersection making it possible to go from the thruway to the filling station via highway No. 187; and at a distance of 515 meters west of the station there is another intersection which can be used for the same purpose. Naturally, these routes are more indirect and less convenient than the direct access eliminated. We will take up this point further on.

The plaintiff appealed to the Superior Court to determine that the petitioner had a "vested right in the entrance access from Avenida Norte (Thruway No. 26) to its filling station," which right could not be allegedly defeated without the payment of compensation. The Superior Court rendered judgment in its favor and the defendant appealed to this Court.

We do not agree with plaintiff for two main reasons independent of each other. One consists in the nature itself of the permit issued by the Secretary of Public Works and the other is based on the law applicable to this situation.

I

From the face of the permit itself it clearly appears that said permit could be revoked or amended whenever it was necessary for reasons of public policy. See the paragraph of the permit cited above. As we shall presently see, there is no question that the permit was amended for reasons of public policy.

In spite of the explicit wording of the revocable and amendable permit, the plaintiff alleges that its amendment deprives it of *its* property and that it has a vested right. Are the words perhaps meaningless? Is it not for the purpose of making things clear that the agreements, contracts, concessions, and permits are reduced to writing? The permit reserves to the Secretary the right even of ordering the removal of the gasoline tanks and pumps whenever necessary. A filling station may operate with two driveways instead of three and with access to one highway instead of two, but it can hardly operate without gasoline tanks and pumps. The plaintiff held and holds a permit which, as the document itself recites, may be revoked or amended. It should be noted that the document does not give occasion for arbitrary revocations or amendments, but only when the public needs make it necessary. That is what is meant by the phrase "whenever the needs of the Commonwealth or Municipal Governments so require" which appears in the afore-cited paragraph of the permit.

## II

However, irrespective of the said clause of the permit, does such vested right of access of the filling station to the express highway exist?

On this problem the American case law is abundant and conflicting, but much less conflicting now than four or five decades ago.[7] The problem has also been treated in the law reviews. The leading case in this field is an oft-cited case decided by the Supreme Court of the United States in 1907, *Sauer* v. *New York*, 206 U.S. 536, 51 L. Ed. 1176. New York constructed a viaduct for public use in front of Sauer's private property which impaired to a material extent the access to the street, and also limited the free admission to it of light and air. The highest court of New York denied compensation and the plaintiff appealed to the Federal Supreme Court

---

[7] Bowie, *Limiting Highway Access*, 4 Md. L. Rev. 219, 245–46 (1940); Comments in 30 Miss. L. J. 197 (1959).

alleging that he had been denied the due process of law in taking his property without compensation. In upholding the New York court, the Federal Supreme Court said that the only question for decision was whether such compensable right of access to the street existed at all, as alleged by the plaintiff, and after citing cases in support of the position taken by New York it added, "Surely such questions must be for the final determination of the state court. It has authority to declare that the abutting land owner has no easement of any kind over the abutting street; it may determine that he has a limited easement; or it may determine that he has an absolute and unqualified easement." It further stated that every state shall make its own decisions on the problem in accordance with its own view of the law and public policy.[8]

Traditionally, in the English[9] and American[10] common law it was recognized in the authorities that the owners abutting on streets and highways have an easement of access to the public thoroughfare. This right was considered as an easement in favor of the adjoining tenement, and it was held that the destruction thereof was compensable. Mr. Justice Holmes, dissenting in *Muhlker* v. *New York & Harlem R. R. Co.*, 197 U.S. 544, 573 (1905), stated that if at the outset the courts had decided that such easement did not exist and that the abutters on streets and highways had only the rights of the public, such decision would have been in no way amazing.[11] Naturally, the courts which established that theory of the easement had before them cases involving land-service roads[12] and were based generally on two views. One of these was the purpose of those highways, which was to provide

[8] 51 L. Ed. 1182.
[9] *Berridge* v. *Ward*, 2 F.&F. 208, 175 Eng. Rep. 1026 (N.P. 1860); *Ramuz* v. *The Southend Local Board*, 67 L.T. 169 (1892).
[10] *Bacich* v. *Board of Control*, 144 P.2d 818, 23 Cal.2d 343 (1943); *People* v. *Ricciardi*, 144 P.2d 799, 23 Cal. 2d 390 (1943).
[11] Three other justices concurred in the dissent of Mr. Justice Holmes. 49 L. Ed. 880.
[12] Labelled in the decisions "land service roads."

694

means of communication to homes, farms, and businesses located therein, and the other that there was an obligation on the part of the State to maintain those highways for the service of those abutters who had contributed directly to their construction by means of special assessments imposed upon them for such purpose and other times ceding the land for their construction.[13] Those circumstances are no longer common. In Puerto Rico some roads are constructed with Commonwealth funds and others with Commonwealth and Federal funds. In the case of freeways the reasoning does not apply, either because, in addition to that financing, they are constructed precisely for the benefit of through traffic and to avoid the danger and inconveniences of frequent intersections and the many ingresses and egresses to business and residences. The opening of thruways to many ingresses would defeat the purpose sought in constructing them at a great cost. The thruways are the antithesis of land-service roads. *Pennysavers Oil Co.* v. *State*, 334 S.W.2d 546, 548 (1960); 13 Mo. L. Rev. 19–25.

■■ This right of easement which, as has been said, was originally created by the English and American courts, of economic value to its owner, evolved and, as was to be expected, it is now recognized practically without exception by those same courts as a right subordinate to the State's police power and subject to the most important social value which is the safety, health, and general welfare of the public. Consequently, the State's police power—the exercise of which, as distinguished from the power of condemnation, does not entail compensation—has been upheld in this matter in cases

---

[13] See, COVEY, *Frontage Roads: To Compensate or Not to Compensate,* 56 Nw. U. L. Rev. 587, 597 (1961); GIBBES, *Control of Highway Access,* 12 S.C.L.Q. 377, 381 (1960); *Freeways and the Rights of Abutting Owners,* 3 Stan. L. Rev. 298, 300 (1951); CUNNYNGHAM, *The Limited-Access Highway from a Lawyer's Viewpoint,* 13 Mo. L. Rev. 19, 31 (1948); CLARKE, *The Limited-Access Highway,* 27 Wash. L. Rev. 111, 116 (1952).

in which one-way traffic,[14] divided roads,[15] U and left-turn prohibitions,[16] regulation on size and capacity of vehicles,[17] the installation of parking meters,[18] and diversion of the traffic,[19] have been established with the inevitable prejudicial consequences to the owners of certain properties and businesses therein located. As stated in *Jones Beach Boulevard Estate* v. *Moses*, 197 N.E. 313, 315, 100 A.L.R. 487, 490, 268 N.Y. 362 (1935): "The rights of an abutter are subject to the right of the state to regulate and control the public highways for the benefit of the traveling public." An identical holding is made in *Muse* v. *Mississippi State Highway Commission*, 103 So.2d 839, 846 (1958). In a recent case also dealing with the loss of access to a highway, the Supreme Court of California reminded that it has long been recognized that there is no right to recover for all elements of damage caused by the construction of a public improvement, and added that the Constitution does not authorize a remedy for every diminution in the value of property that is caused by a public improvement. *People* v. *Symons*, 357 P.2d 451, 453 (1960).

---

[14] *Chissell* v. *Baltimore*, 69 A.2d 53, 193 Md. 535 (1949); *Cavanaugh* v. *Gerk*, 280 S.W. 51, 313 Mo. 375 (1926).

[15] *Iowa State Highway Commission* v. *Smith*, 82 N.W.2d 755, 248 Iowa 869 (1957); *People* v. *Thompson*, 260 P.2d 658 (Cal. Dist. Ct. 1953); *People* v. *Savig*, 226 P.2d 702, 101 Cal. App. 2d 890 (1951); *Fort Smith* v. *Van Zandt*, 122 S.W.2d 187, 197 Ark. 91 (1938).

[16] *Iowa State Highway Commission* v. *Smith, supra*, footnote 15; *Jones Beach Blvd. Estate* v. *Moses*, 197 N.E. 313, 100 A.L.R. 487, 268 N.Y. 362 (1935).

[17] *Wilbur* v. *City of Newton*, 16 N.E.2d 86, 121 A.L.R. 570, 301 Mass. 97 (1938).

[18] *Morris* v. *City of Salem*, 174 P.2d 192, 179 Ore. 666 (1946).

[19] *Wolff* v. *City of Los Angeles*, 193 Pac. 862, 863, 49 Cal. App. 400 (1920); *City of Stockton* v. *Marengo*, 31 P.2d 467, 137 Cal. App. 760, 764 (1934); *Nelson* v. *State Highway Board*, 1 A.2d 689, 118 A.L.R. 915, 110 Vt. 44 (1938); *Elks* v. *Board of Commissioners*, 102 S.E. 414, 179 N.C. 241 (1920); *Board of Supervisors of Chenango County*, 13 N.Y. Supp. 2d 730, 257 App. Div. 1058 (1939); *People* v. *Gianni*, 20 P.2d 87, 130 Cal. App. 584 (1933); *Quin* v. *Mississippi State Highway Commission*, 11 So.2d 810, 194 Miss. 411 (1943); *In re Appointment of Viewers, Johnson*, 23 A.2d 880, 344 Pa. 5 (1942).

There are cases which are very similar to the case at bar. In *Wood* v. *City of Richmond*, 138 S.E. 560 (1927),[20] the plaintiff erected a filling station fronting on two streets; a revocable permit was issued by the authorities to construct a driveway on each street; after constructing the two driveways he was directed by the authorities to remove one of them which was in violation of a zoning ordinance. The plaintiff alleged that he had the right of access to both streets. The court held that his right of access was subordinate to the right of the municipality to so control the use of the streets as to promote the safety, health, and general welfare of the public.

In *Pennysavers Oil Co.* v. *State, supra*, decided in 1960, the question involved, as in the case at bar, was the loss by a filling station of the direct access to a highway. Highway No. 9 was, prior to the improvement, an ordinary or conventional highway to which the filling station had access. That road was afterwards designated a controlled-access highway and the filling station lost its direct access, retaining only a limited access. Before the reclassification of the highway the filling station was a prosperous business, but after the change it became a losing proposition. The court held that the change of the conventional highway into freeway comes within the State's police power and, therefore, it was not bound to pay. Said the court, "no abutting property owner has a vested interest in the traffic that passes in front of his property."

In *Farmers-Kissinger Market House Co.* v. *City of Reading*, 165 Atl. 398 (1933), the plaintiff owned several businesses in a certain area, one of which was a garage fronting a street. The lot fronted two streets and the plaintiff planned

---

[20] Cited with approval in *Town of Leesburg* v. *Tavener*, 82 S.E.2d 597, 600 (1954); *Farris Bowling et al.* v. *City of Somerset*, 333 S.W.2d 769 (1960); *Windsor* v. *Lane Development Co.*, 158 N.E.2d 391, 394 (1958); *City of Miami* v. *Girtman*, 104 So. 2d 62 (1958), and *Alexander Co.* v. *City of Owatonna*, 24 N.W.2d 244, 258 (1946).

to add to the garage another access to the other street. The plaintiff's plans were approved by the authorities, which also issued the corresponding permits. After the work was partly constructed the authorities revoked the permit for access to the second street. The denial of the second access was upheld. The court stated at p. 401 that community life requires some curtailment of the individual's freedom in the use of his property.

In *City of San Antonio* v. *Pigeonhole Parking*, 311 S.W.2d 218, 73 A.L.R.2d 640 (1958), there was involved a 10-story parking garage the lot of which fronted two streets. Access was permitted to only one of the streets and the court upheld the authorities in the exercise of the State's police power. There it was said at p. 223 that the test of reasonableness of the action of the authorities is not solely one of whether such driveway was essential to the operation of the business, but whether such driveway would expose the public to greater hazard than the detriment caused by the denial. For other cases upholding the same principle in similar situations, see *Darnall* v. *State*, 108 N.W.2d 201, 205 (1961), "The construction of a highway past a place of business gives owners no vested right to insist that it remain there as a changeless road in a changing world." *Nick* v. *State*, 109 N.W.2d 71 (1961); *Department of Highways* v. *Jackson*, 302 S.W.2d 373 (1957); *Iowa* v. *Smith et al.*, 82 N.W.2d 755, 73 A.L.R.2d 680; *Hillerege* v. *City of Scottsbluff*, 83 N.W.2d 76; *Smith* v. *Baltimore*, 176 Atl. 642 (1935); *Fowler* v. *City*, 246 S.W. 638 (1923). In 73 A.L.R.2d 691 it is said: "Virtually all, if not absolutely all, the cases within the scope of the present annotation recognize either expressly or inferentially that government in general, or the appropriate governmental unit under a proper delegation of authority, has the power to promulgate or enforce traffic regulations in the general public interest, even if they interfere to some extent with the

convenience of an abutter's access, or compel some circuity of route."

■ ■ As stated hereinabove, in this case both accesses to highway 187 remained untouched, but the direct access from highway 26 to the filling station will be eliminated and in its place the two limited accesses mentioned above will remain, one at 142 meters and the other at 515 meters from the garage. It has been held that the inconvenience caused to the tenement abutting on the highway, an inconvenience shared by the general public, is not recoverable whenever for reasons of safety and traffic regulation it is necessary to establish more limited, long, or inconvenient accesses than those which the adjoining property originally enjoyed. These longer and limited accesses are the result of the modern roads and of the solutions offered by the civil engineering for the solution of heavy-traffic problems and to eliminate from the public highways the source of accidents caused as a result of the frequent intersections and the entrances and exits to adjoining properties. The American authorities have labelled this situation "circuity of travel," and it is recognized that it is a legitimate exercise of the State's police power and that it does not constitute the taking of, or prejudice to, the private property and is not therefore recoverable. *Wilson* v. *Iowa State Highway Commission*, 90 N.W.2d 161 (Iowa 1958); *Carazalla* v. *Wisconsin*, 71 N.W.2d 275 (1955); *Brady* v. *Smith*, 79 S.E.2d 851 (W. Va. 1954); *Lindley* v. *Oklahoma Turnpike Authority*, 262 P.2d 159 (Okla. 1953); *Beckman* v. *State*, 149 P.2d 296, 64 Cal. App.2d 487 (1944); *Cavanaugh* v. *Gerk, supra; Fort Smith* v. *Van Zandt, supra; People* v. *Savig, supra;* Annot. 100 A.L.R. 491 (1936). In *Jones Beach Boulevard, supra*, a five-mile limited access was upheld as necessary under the circumstances of that place.

Although there are exceptions,[21] it is generally held that if the access to the highway is *totally* blocked then the owner of the impaired tenement is entitled to compensation.[22] In Puerto Rico no property would be permanently surrounded if its owner takes proper steps, since the Civil Code provides that the owner of a tenement surrounded by others and having no exit to the public highways has the right to demand the right of way through the neighboring tenements on paying proper indemnity. 31 L.P.R.A. §§ 1731–1737.

The Master Plan for Major Thoroughfares of 1947 was revised by the Board in 1954 in the exercise of its powers and duties.[23] The development which has taken place in Puerto Rico in the past years is of general knowledge. Such growth has positive and negative indices. In 1940 the population of the Metropolitan Area of San Juan was 338,537 persons; in 1950, 508,570; and in 1960 it went up to 647,979.[24] During 1947 and 1954 the number of motor vehicles increased by 120 per cent.[25] In 1954 almost one half of the total number of vehicles in Puerto Rico belonged to the Metropolitan Area.[26] The same is true at present.[27] During

---

[21] *Socony-Vacuum Oil Co.* v. *Murdock*, 1 N.Y.S.2d 574, 165 Misc. 713 (Sup. Ct. 1937); *Barrett* v. *Union Bridge Co.*, 243 Pac. 93, 117 Ore. 220 (1926).

[22] *People* v. *Al G. Smith Co.*, 194 P.2d 750, 86 Cal. App. 2d 308 (4th Dist. 1948); *United States* v. *Welsh*, 217 U.S. 333 (1910); *Bohm* v. *Metropolitan Ry.*, 29 N.E. 802, 129 N.Y. 576 (1892); 29 C.J.S., *Eminent Domain* 1038, § 167, n. 27 (1941). See, also, 73 A.L.R.2d 659.

[23] Master Plan, etc., cited in footnote 2, pp. 1–17.

[24] Planning Board, Financial Report to the Governor 85 (1961).

[25] Planning Board, *Statistical Yearbook* 205 (1959). It is unlikely that the plaintiff has overlooked this datum, since it must have reflected in its gasoline sales in Puerto Rico.

[26] Planning Board, *Statistical Yearbook* 206 (1959). The municipalities of San Juan, Bayamón, Carolina, Guaynabo, Cataño, and Trujillo Alto were taken in this computation.

[27] The last datum was obtained late in 1961. Official information furnished by the Department of Public Works of P.R., in charge of the registration of motor vehicles in P. R.

those same years the traffic accidents increased by more than 50 per cent.[28]   The Police reports that one half of the total number of accidents in the Island occurred in the metropolitan area.[29]   The death index per million of vehicles-miles travelled is 15.5 in Puerto Rico; in the United States it is 5.3 (year 1960).[30]   This high accident index is a source of preoccupation to the community; the press has frequently treated the problem in its editorial notes; the Chief Executive has made reference to it in his 1960 and 1961 annual messages to the Legislative Assembly of the country.   The community has adopted measures on the matter: a new Traffic Act, 9 L.P.R.A. § 301 *et seq.*, increase of the police force, road improvements, construction of modern crossings at different levels (clover leaves), more intersections, and construction of controlled-access highways.[31]

Thruway PR–26, as stated before, runs from San Juan to the International Airport, the largest airport of the Island. In 1947 the number of passengers who arrived in and departed from Puerto Rico by that airport was 237,374;[32] in 1954, 605,005; and in 1961, 1,472,991.   Every day more than 4,000 passengers arrive at and leave from that airport. The daily flights exceed 100.   In 1961, 23,978 tons of freight passed through that airport.[33]   Almost all those passengers and freight enter and leave the airport by highway No. 26. It is clear that, in view of that reality of a rapidly growing community and after seven years, the Planning Board was

[28] Planning Board, *Statistical Yearbook* 34 (1959).

[29] Puerto Rico Police, *Statistical Data* 26 (1961).

[30] Francisco Lizardi, Secretary of Public Works of P.R., Speach delivered before the Assembly of the Civic Traffic Safety Crusade, May 29, 1962.

[31] On the necessity of controlled-access highways due to modern living conditions, see GOTTMAN, Megapolis 631, ch. 12 (1961); and RIGOTTI, *Urbanismo* 117 (1960).

[32] *Statistical Yearbook* 218 (1959).

[33] Puerto Rico Ports Authority, *Annual Report* 2, 4, and 5 (1961).

fully justified in revising the Master Plan for Major Thoroughfares.

■ Moreover, the zoning regulations and determinations are not contracts; the proper public agencies may modify them whenever it is necessary. *Reichelderfer* v. *Quinn*, 287 U.S. 315, 77 L. Ed. 331 (1932); *Clifton Hills Realty Co.* v. *Cincinnati*, 21 N.E.2d 993 (1938).

The plaintiff contends that the Planning Board permit officer issued to it a permit of use on December 21, 1955, namely, after the revision of the Master Plan made by the Board. This situation is different from that which we considered in *Phi Delta Phi* v. *Planning Board*, 76 P.R.R. 547. In that case the work was not so closely related to the public interest as a thruway in such a congested area as the metropolitan area of San Juan; that case involved a private clubhouse. Moreover, in the case at bar, as distinguished from the problem raised in *Phi Delta Phi*, the building has not been rendered ineffective and useless, since, as has been said, that filling station continues to enjoy several accesses to the highways of Puerto Rico and the structure is being used by virtue of such permit. See, also, *S. B. Garage Corporation et al.* v. *Murdock*, 55 N.Y.S.2d 456, 459 (1945); I RATHKOPF, The Law of Zoning and Planning 897, 3d ed.

■ Regarding the question of whether or not to compensate for the limitations of the abutters' access to the new thruways or whenever a conventional road is converted into a thruway, a great majority of the authorities favor the norm not to compensate on the ground that it is a justified and necessary exercise of the State's police power. Undoubtedly, this clear trend of the contemporaneous decisions in practically all jurisdictions is due to the fact that the courts, like the general public, understand that modern living makes the construction of thruways necessary and as pointed out by some at times indispensable. The large urban centers have grown enormously, the main arteries are congested by the

traffic of motor vehicles, people live farther from places of work, education, recreation, etc. Those who have studied the problem also point out that the thruways, with a minimum of intersections, with crossings at different levels and one-way traffic, reduce considerably the number of accidents. The well-settled rule which originally created, as we indicated at the beginning, the right of access, stemmed from considerations of public policy. The circumstances which gave rise to that rule having changed, it may be understood why the courts have formulated a new rule, also founded on considerations of public policy, in consonance with the circumstances of our times.[34]

■■■■■ In view of the rule established by the afore-mentioned authorities and of the foregoing considerations, we conclude that the right of the State, which is also an obligation, to regulate the traffic of motor vehicles and to construct public works for the better flow thereof is a legitimate exercise of the State's police power. Such police power, which is indispensable to enable the State to do its duty to look after the safety, health, and general welfare, is broad, and the fact that in a particular instance its legitimate exercise makes impossible the most beneficial use of a property does not render it unconstitutional, *Goldblatt et al.* v. *Town of Hempstead*, 369 U.S. 590, 592 (1962). The case at bar comes

---

[34] In addition to the articles cited in footnotes 7 and 13, see 33 Wis. L. Rev. 567 (1959); 109 U. Pa. L. Rev. 120 (1960); 18 Wash. & Lee L. Rev. 138 (1961); 11 Baylor L. Rev. 165 (1958); 35 N.D.L. Rev. 77 (1959); I Current Municipal Problems 62 (1959); 3 *ibid.* at 14 (1961); 3 *ibid.* at 101 (1962), and 33 Oregon L. Rev. 16, 40 (1953), in which it is said: "[I]t is submitted that the public interest in promoting a highway program of access limitation demands a judicious effort to prevent the dissipation of public funds in the acquisition of access rights which would result from any unwarranted extension of the abutting landowner's right of access."

On the approach to these situations created by great social changes, see FRIEDMAN, Law in a Changing Society 80 (1959)—"American legal opinion has moved far from the days when the sacrosanctity of private property was the core of its thinking"—and POUND in 46 Minn. L. Rev. 117 (1961).

within the stated rule. In this case there was no total destruction of plaintiff's access to the public highways. There is no absolute right of access from the adjoining properties to the public highways; such right, like any other right, is subordinate to the reasonable exercise of the State's police power. When constructing new thruways or converting conventional highways into thruways, the State may modify and limit the access of the abutting tenements to the thruway.

Lastly, the conflict of interests in these cases is not actually a conflict between the interests of the owner of the tenement and the State, but between the interest of the owner of the tenement and the community in general which is the user and beneficiary of the public highways.

The judgment rendered in this case by the Superior Court, San Juan Part, on November 21, 1958, will be reversed and the complaint dismissed.